**ARKWRIGHT MUTUAL INSURANCE COMPANY, Appellant,**

**v.**

**BARGAIN CITY, U. S. A., INC.**

**No. 15899.**

United States Court of Appeals Third Circuit.

Argued Oct. 6, 1966.

Decided Jan. 31, 1967.

Rehearing Denied March 13, 1967.

702

George E. Beechwood, Philadelphia, Pa., for appellant.

Edward Greer, Philadelphia, Pa. (Paul L. Jaffe, Mesirov, Gelman, Jaffe & Levin, Philadelphia, Pa., on the brief), for appellee.

Before FORMAN, FREEDMAN and SEITZ, Circuit Judges.

## OPINION OF THE COURT

FORMAN, *Circuit Judge.*

This is an appeal from an order of the United States District Court for the Eastern District of Pennsylvania denying the motion of the appellant, Arkwright Mutual Insurance Company, a Massachusetts corporation, for summary judgment and granting summary judgment in favor of the appellee, Bargain City, U. S. A., Inc., a Pennsylvania corporation. The appellant will hereinafter be called Arkwright, and the appellee, Bargain City. Jurisdiction is by reason of diversity of citizenship.

The following material facts are undisputed except where otherwise indicated. On October 4, 1960, Arkwright issued a policy of insurance securing *inter alia* Bargain City against loss of rental income from certain buildings and structures located in Horsham Township, Montgomery County, Pennsylvania, including that caused by physical damage due to the impact of aircraft. Less than a year later, on August 27, 1961, a United States Navy jet aircraft crashed into the Bargain City premises at Horsham causing a loss of actual rental income in excess of $100,000.

Bargain City made claim against Arkwright under the policy but the claim was held in abeyance while Bargain City sought recovery from the United States. This course was pursued by filing a claim with the Department of the Navy [1] rather than by instituting suit under the Federal Tort Claims Act.[2] An agreement was reached whereby Bargain City would accept $156,000 in settlement of its claim

1. Apparently pursuant to the Military Claims Act, 10 U.S.C. § 2733.

2. 28 U.S.C. § 1346.

for rental damages and the Navy would recommend payment of this amount to the Bureau of the Budget.

In March 1962, about seven months after the crash, Bargain City requested and received an "advance" from Arkwright in the amount of $100,000, made in accordance with an agreement and loan receipt described in detail in the opinion of the District Court.[3] Essentially they provided that the fund appropriated by the United States for the settlement of Bargain City's claim would be the source of the repayment of the loan; that Bargain City would deliver instruments to enable Arkwright to obtain the fund from the disbursing authorities of the United States; that any amount in excess of the $100,000 would be returned to Bargain City; and that if the appropriation were less than $100,000, Bargain City would make up the difference. If the recovery amounted to less than $156,000, Bargain City reserved the right to claim up to that amount under the policy. Arkwright claims that it thereby acquired an equitable lien on the fund.

Following a meeting of the representatives of Bargain City and officials of the Navy Department, the Under Secretary of the Navy wrote to the Director of the Bureau of the Budget "reporting" a claim of $228,404.34, including $156,000 due to "loss of profits," i.e. loss of rental income.

On October 19, 1962, Bargain City filed a petition in the United States District Court for the Eastern District of Pennsylvania, proposing an arrangement under Chapter XI of the Bankruptcy Act,[4] whereupon two receivers were appointed.[5] Attached to the petition were sworn schedules of Bargain City's debts, creditors, and assets. On standard form Schedule A–3, entitled "Creditors Whose Claims Are Unsecured," appears the typewritten statement:

"All creditors' claims are on open account unless otherwise indicated."

Among those so scheduled is the following listing:

" * Arkwright Mutual Insurance Co., Boston, Mass.     100,000.00
    * Advance re: Horsham airplane crash claim against U.S. Navy."

On Schedule B–3, entitled "Choses in Action," appears the listing:

"Claim against U. S. Navy Department arising out of Navy airplane crash at Store #10, Horsham, Pa., on August 27, 1961. Claim adjusted, but not yet covered by Congressional appropriation.     228,404.00."

Arkwright's actual participation in these proceedings is a matter of some dispute. Arkwright was a scheduled creditor, yet it alleges that it received no notice of the proceedings until January 1, 1963, about seven weeks before they terminated. Undisputed, however, is that Arkwright neither made a formal appearance nor filed a claim.

Upon confirmation of an arrangement on March 12, 1963, the receivers were discharged and the proceedings terminated. The arrangement provided for payment to the unsecured creditors of 15% of their claims in 48 monthly installments. Arkwright's share was thus held to be $15,000, payable in installments of $312.50 each.[6] A check dated May 8, 1963, was sent to Arkwright by Bargain City covering two installments, which Arkwright returned, indicating its refusal to accept payment as a general creditor.

---

3. 251 F.Supp. 221, 223–224 (E.D.Pa.1966).

4. 11 U.S.C. § 701 et seq.

5. 11 U.S.C. § 732.

6. At the time of these proceedings, a creditor such as Arkwright who had not filed a claim could share in the distribution, payment being made on the basis of the debtor's schedule. The amendment of Section 355 (11 U.S.C. § 755) in November 1963, making Section 57(n) applicable in Chapter XI proceedings and conforming amendments to Sections 334, 355(3), and 369(2) and (3) ended this practice. See Sen.Rep. No. 605, 88th Cong., 1st Sess., 1963.

On May 17, 1963, Congress appropriated money to pay Bargain City's claim in accordance with the letter of the Navy Department of April 23, 1962. Shortly thereafter, Arkwright instituted this action in the District Court seeking recovery of the $100,000 loan. It obtained a temporary restraining order which prevented Bargain City from disposing of the money to be received from the Government, which was later modified to require Bargain City to deposit $100,000 of the amount received in the Registry of the District Court, where it remains pending this appeal. On June 4, 1963, the United States issued a check covering the total amount of Bargain City's adjusted claims.

On a stipulation of the parties, authorizing the District Court to decide this case as if both parties had filed motions for summary judgment, the District Court held: (1) No constructive trust arose upon the fund in favor of Arkwright; (2) Arkwright acquired no equitable lien upon the fund; (3) Bargain City's claim against the United States became part of the administrable estate in the Chapter XI proceedings; (4) Arkwright's security interest was unperfected under Pennsylvania's Uniform Commercial Code.[7] Thus, granting Bargain City's motion for summary judgment, the District Court awarded the fund to Bargain City with interest and costs payable by the appellant Arkwright.

The only error asserted by the appellant Arkwright is the District Court's determination that it acquired no equitable lien on the appropriated fund. Whether or not such a lien arose is a question of state law,[8] here that of Pennsylvania. We will assume *arguendo* that as a matter abstracted from subsequent events, Arkwright possessed a claim which might have been entitled to special treatment against the receivers in the Chapter XI proceedings as an equitable security interest.[9] But this is not a case wherein a creditor is asserting an equitable lien against a receiver during the course of the proceedings; rather it is a case in which a creditor, scheduled as the holder of an unsecured claim, permitted the proceedings to terminate before asserting its rights. The inaction of Arkwright during the intervening Chapter XI proceedings changed both the equities in the case and the legal result.

7. The pertinency of this determination appears questionable. See note 9 infra.

8. In re Dier, 296 F. 816, 819 (3 Cir. 1924); see 4 Collier, Bankruptcy § 70.72, n. 3 (14th ed. 1964); cf. In re Italian Cook Oil Corp., 190 F.2d 994 (3 Cir. 1951).

It should also be noted that the validity of the asserted equitable assignment under state debtors' and creditors' law should not be affected because of the involvement of the United States as payee. The Federal Anti-Assignment Statute (31 U.S.C. § 203), which merely renders an assignment of this type void as against the United States before the issuance of a warrant for the fund is not intended to affect the equities of the parties. McKenzie v. Irving Trust Co., 323 U.S. 365, 367, 65 S.Ct. 405, 89 L.Ed. 305 (1945); United Pacific Ins. Co. v. United States, 358 F.2d 966, 969–970 (Ct.Cl.1966) and cases cited therein. In fact, to the extent that the loan agreement provided for a delay in the transfer of documents authorizing payment of the fund directly to Arkwright, and the latter waited until the check was about to be issued to take action to secure transfer, the course seems consistent with the statutory purpose to protect the United States against multiple claims to single funds. See Martin v. National Surety Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937).

9. Permitting this assumption is the fact that Arkwright's claim avoids the interdiction of Section 60(a) (6) of the Bankruptcy Act (11 U.S.C. § 96) applicable in Chapter XI proceedings by the force of Section 302 (11 U.S.C. § 702) against the "recognition of equitable liens where available means of perfecting legal liens have not been employed". We can find no method by which Arkwright could have recorded its interest. Contrary to the assertion of the appellee, the transaction was beyond the pale of the Uniform Commercial Code of Pennsylvania, which excludes from its scope "a transfer in whole or in part of * * * any claim arising out of tort". 12A Pa.Stat.Ann. § 9–104(k). See also 12A Pa.Stat.Ann. § 9–104(g).

As noted above, Arkwright was scheduled as an unsecured creditor in the amount of $100,000 and was not designated either expressly or impliedly as a creditor entitled to treatment as a secured party. The notation by asterisk that the credit was attributable to an advance "re: Horsham airplane crash claim against U. S. Navy," gave no indication of Arkwright's purported secured status, but at best might have implied that while Arkwright was an unsecured creditor, it was not one "on open account." [10] On the other hand, the entire claim against the United States, including the amount allocable to the loss of rental profits, was listed as an asset available for the implementation of any arrangement of Bargain City's indebtedness that might result from the proceedings. The creditors of Bargain City were entitled to rely upon this statement of affairs in assessing whether the contemplated arrangement was in their best interest, subject to those misstatements or errors which could reasonably fall under their scrutiny during their examination of the debtor and its accounts. The same qualified reliance was to be accorded the bankruptcy court in determining whether the arrangement was equitable, feasible, and otherwise in compliance with the requirements for confirmation in Section 472 of the Bankruptcy Act.[11]

A presumptive equitable lien like that of Arkwright could come to the attention of the creditors in the arrangement proceeding only by notice in fact, since it was neither recorded nor amenable to that type of notification imputed to possession. Likewise, it was not the subject of any settled exception to these methods of perfection,[12] which might have channeled the lines of inquiry during the examination of the debtor's accounts. Thus while Arkwright here urges that we equate its alleged equitable interest with a legally perfected security interest, which would ride through and remain unaffected by the arrangement proceeding,[13] it is apparent that this equation depends on whether the creditor who claims the interest has supplied the other creditors with the very element which differentiates the two categories of liens—namely, the notice they would not otherwise have.[14]

Were this all, perhaps the proper procedure would be to return the matter to the District Court for a determination of whether the details of the agreement creating the alleged equitable lien in fact came to the attention of the bankruptcy court, despite the failure of Arkwright to press its claim therein. The defect in this suggestion lies in the nature of the equitable lien. As Justice Holmes said in Sexton v. Kessler:[15]

"Whether enough has been done to give a right of any kind in certain property is a question of more or less. * * * [T]he phrase 'equitable lien' may not carry the reasoning further or do much more than express the opinion of the court that the facts give a priority to the party said to have it".

Simply put, the determination of the existence of an equitable lien depends highly upon a meticulous analysis of the facts and commercial realities of a transaction

---

10. An "open account" or "current account" merely signifies an account "between two parties having an unfinished series of money transactions." Webster's New International Dictionary of the English Language (2nd ed. 1961).

11. 11 U.S.C. § 872.

12. E. g., the limited non-possessory and unfiled security interests specified in Section 9–302 of the Uniform Commercial Code (12A Pa.Stat.Ann. § 9–302).

13. 11 U.S.C. § 706(1); see 8 Collier, Bankruptcy § 207 [3] (14th ed. 1964).

14. The problems created during an arrangement proceeding due to the secrecy of an equitable lien are not to be confused with the general problem of potential creditors being misled in their business dealings with the debtor. The latter militates against the recognition of *any* equitable liens in bankruptcy. But equitable liens are still cognizable to the extent they are valid under state law and not subject to Section 60(a) (6) of the Bankruptcy Act. See note 9 supra.

15. 255 U.S. 90, 98–99, 32 S.Ct. 657, 56 L.Ed. 995 (1912).

as a whole,[16] and the law governing the formal requirements of its creation is obscure [17] to the extent that it must be so clearly disclosed as to charge other creditors with recognition of it. It follows that it was incumbent upon Arkwright, assuming that it had notice of the proceedings, to marshal the facts of the transaction and alert the creditors to their professed legal significance by presenting its claim during the course of the proceedings. To hold otherwise would, as in this case, seriously upset the stability and utility of arrangements accomplished under Chapter XI.

 The only remaining question is whether the record shows that Arkwright received notice of the proceedings in time to protect its supposed equitable lien. Although Arkwright was listed as a creditor on the Chapter XI schedule, and the Bankruptcy Act requires the court to give notice to the creditors within ten days after the filing of the petition,[18] which was on October 12, 1962, Arkwright claims that it did not receive notice at this time. We do not have the record of the Chapter XI proceedings before us to determine whether such notice was in fact sent to or received by Arkwright. However, it is unnecessary for us to engage in any presumption that the officers of the bankruptcy court complied with this statutory duty, since Arkwright admits that it did receive notice of the proceedings on January 23, 1963, which was a full seven weeks before they were terminated. Yet during this time Arkwright made no attempt to present its claim or alert the other creditors to its existence.

In summary, we hold that where a creditor claims a security interest which is at best equitable in nature, and fails to present that claim during arrangement proceedings of which it has notice and a reasonable time to do so, we will not, in the circumstances of this case, give effect to a claim for security which depends for its enforcement upon the equitable discretion of this court.[19] The judgment of the United States District Court for the Eastern District of Pennsylvania will be affirmed.

---

16. See Britton, Equitable Liens—A Tentative Analysis of the Problem, 8 N.C.L. Rev. 388 (1930).

17. See 1 Gilmore, Security Interests in Personal Property, § 7.2 (1st ed. 1965).

18. 11 U.S.C. § 738.

19. Cf. Jamison Coal & Coke Co. v. Goltra, 143 F.2d 889 (8 Cir. 1944).