**In re NORTHVIEW MOTORS, INC., Debtor.**

**Frank P. CUDA, Joann Cuda, and Northview Motors, Inc., Movants,**

v.

**Joseph P. NIGRO, Trustee for the Estate of Northview Motors, Inc., Respondent.**

**Bankruptcy No. 91–23375–MBM. Motion No. 96–2438–M.**

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 14, 1996.

---

390

**392**

Robert G. Sable and Thomas M. Ferguson, Pittsburgh, PA, for Frank Cuda, Joann Cuda and Northview Motors, Inc.

James M. Malley, Pittsburgh, PA, for Joseph P. Nigro, Trustee.

James F.B. Daniels, Kansas City, KS, and Christine Donohue, Pittsburgh, PA, for Chrysler Corporation.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

### STATEMENT OF FACTS

■ Frank P. and Joann Cuda (the Cudas), principals of Northview Motors, Inc. (Northview), the debtor in this bankruptcy case, bring this motion requesting that this Court order respondent, the Chapter 7 trustee in this case, to abandon to them[1] a lawsuit pending on behalf of the debtor against Chrysler Corporation (Chrysler). Such property presently constitutes property of the bankruptcy estate pursuant to 11 U.S.C.

§ 541(a)(1). Prior to the filing of this motion, the trustee had filed with this Court a motion requesting that this Court approve a proposed settlement of said lawsuit with Chrysler for $150,659.97.[2] The trustee had entered into negotiations on behalf of the bankruptcy estate culminating in said proposed settlement. However, after several hearings on the motion for approval of the settlement, the Cudas bring this motion for abandonment because they assert that the lawsuit does not have any value to the estate. The Cudas support that contention by asserting that they have a security interest in the lawsuit, and that the value of said security interest exceeds the probable value of any proceeds from the lawsuit. At the time of the debtor's petition filing, Mellon Bank (Mellon) had a claim in this case for $574,998.94. The Cudas assert that Mellon also possessed, as collateral for this claim, a security interest in the lawsuit. However, the Cudas, who were secondarily liable with the debtor on Mellon's claim, satisfied said claim at some time prior to the hearing on the trustee's settlement motion. The Cudas now assert that, pursuant to 11 U.S.C. § 509(a), they are subrogated to the claim of, as well as the alleged security interest in the lawsuit held by, Mellon.[3]

■ Chrysler objects[4] to the Cudas' motion because it contends that they do not presently possess a security interest in the lawsuit. Chrysler argues primarily that the Cudas could not have been subrogated to a secured position in the lawsuit because (a) one of the two remaining counts in the lawsuit in question, which sets forth a claim under the "Automobile Dealers Day in Court

---

1. Northview Motors, Inc., the debtor, is also listed as a movant in this motion. However, for the reasons set forth in the parenthetical passage accompanying this Court's citation to *In re Dewsnup*, 908 F.2d 588, 590 (10th Cir.1990), on page 394 of this opinion, if the Cudas prevail on this motion, they are the proper parties to whom the lawsuit should be abandoned. Therefore, the Cudas are consistently referred to as the sole movants throughout the remainder of this opinion.

2. The proposed settlement amount of $150,659.97 is comprised of a cash payment from Chrysler of $115,000.00 and Chrysler's agree-

ment to withdraw two unsecured claims that it has filed in this case totaling 35,659.97.

3. The Cudas have also brought a separate motion in this case regarding their claim for subrogation to the various rights of Mellon at Motion No. 96–1321–M. The decision herein regarding the motion for abandonment will necessarily dispose of Motion No. 96–1321–M.

4. Chrysler, in addition to being the defendant in the debtor's lawsuit, is also a creditor in this bankruptcy case. Therefore, Chrysler has standing to object to the Cudas' motion as a party in interest in this matter.

Act" (ADDCA), is essentially a tort claim, (b) it is impossible to obtain a security interest in a tort claim under Pennsylvania law pursuant to 13 Pa.C.S.A. § 9104(11), and thus (c) Mellon, the subrogor to the Cudas, never possessed a security interest in the ADDCA action. Chrysler also asserts that Mellon may not have possessed a security interest in the breach of contract action set forth in the other remaining count of the lawsuit. Chrysler finally maintains that the Cudas have not demonstrated their right to subrogation under § 509(a) because (a) subrogation is an equitable remedy and the equities in this case do not favor subrogation by the Cudas, (b) pursuant to § 509(b)(1)(C), subrogation is not possible in this case because the Cudas' claim for reimbursement should be subordinated under 11 U.S.C. § 510, and (c) the Cudas, in their motion for abandonment, did not offer proof as to the validity of the security interest held by Mellon, as well as the perfection of such interest at the time of this petition filing.

The Cudas counter Chrysler's objections by asserting that (a) the debtor's claim under the "Automobile Dealers Day in Court Act" is not a tort action but rather is one based upon the franchise contract between the debtor and Chrysler, (b) because the ADDCA claim is a contract action and not grounded in tort, Mellon possessed a security interest in that action, (c) Mellon also possessed a security interest in the breach of contract action pleaded in the other remaining count of the lawsuit, and (d) they are entitled to

subrogation via § 509(a) because the equities favor such subrogation, their claim for reimbursement should not be subordinated under § 510, and the security interest of Mellon is valid and unavoidable under other provisions of the Bankruptcy Code.

■ The trustee made certain concessions at the hearing on this motion, and the Court understands such concessions to be that (a) the Cudas had paid the claim of Mellon, (b) the Cudas were secondarily liable on such debt with the debtor, and (c) Mellon's security agreement covered, *inter alia*, general intangibles and choses in action of the debtor. The Court is not aware of any objection by Chrysler on the first two of these points, and will overrule any objection by Chrysler as to the validity of Mellon's security agreement based upon the Court's own examination of the instrument, which was attached as part of Exhibit C to the Cudas' response in Motion No. 96–1330–M, which is a related motion in this case. However, the Court is not certain whether the trustee's concession also extends to the Cudas' assertions that any security interest held by Mellon (a) is valid pursuant to 13 Pa.C.S.A. § 9203(a) (ie., attachment had occurred),[5] and (b) was perfected at the time of the commencement of this case, thereby immunizing said interest from avoidance by the trustee. The only issue that the Court can detect regarding validity of Mellon's security interest revolves around the value of said interest (ie., was Mellon's entire claim secured by said lawsuit).[6] With respect to perfection, the Court

---

**5.** 13 Pa.C.S.A. § 9203(a) provides, in pertinent part, that:

[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
(1) ... the debtor has signed a security agreement which contains a description of the collateral ...;
(2) value has been given; and
(3) the debtor has rights in the collateral.

13 Pa.C.S.A. § 9203(a) (Purdon 1995).

**6.** The Court believes that the debtor had rights in the lawsuit against Chrysler prior to the commencement of its bankruptcy case although said lawsuit was not initiated until after the petition filing because an action accrues at the time of the alleged injury and not when an action is initiated. Thus, 13 Pa.C.S.A. § 9203(a)(3) was

satisfied prior to the commencement of this bankruptcy case. However, an examination of Exhibit C to the Cudas' response in Motion No. 96–1330–M does not establish with certainty that Mellon had conveyed value for said interest equal to the amount of the Cudas' present claim for reimbursement (ie., $574,998.94). While the Court notes the inclusion in this exhibit of a $1.5 million dollar floor plan financing note, it cannot be certain as to the accompanying collateral for said note. Rather, all that is attached in the exhibit is a subsequent note with an accompanying security agreement in, *inter alia,* general intangibles and choses in action. This subsequent document only evidences a conveyance of value equal to $77,559.82. While the Court certainly presumes that the Cudas can establish that the remaining amount of Mellon's claim was also secured by the same collateral, it cannot order abandonment of the lawsuit until such fact is

**394**

cannot make any determination on the basis of the documentation that it presently has. Because these particular points also appear to be a subject of contention by Chrysler, the Court will delay a ruling regarding them. As a practical matter, the lawsuit cannot be abandoned until these points have been sufficiently resolved. However, the remaining issues in this motion may be resolved at this time.

### DISCUSSION

■ As set forth in the trustee's settlement motion, the trustee proposes a settlement of the lawsuit between the bankruptcy estate in this case and Chrysler for $150,-659.97. This Court is convinced that abandonment of the lawsuit to the Cudas is required pursuant to 11 U.S.C. § 554(b) [7] if they actually (a) possess an unavoidable security interest therein, and (b) said interest is actually valued, as they assert, at $574,998.94 (i.e., their claim for reimbursement for payment of Mellon's claim).[8] The Court arrives at this conclusion because, if the Cudas possess said interest, the lawsuit simply will not generate any funds for unsecured creditors and would, therefore, be "of inconsequential value and benefit to the estate." The Court cites *In re Lehal Realty Associates*, 184 B.R. 205 (Bankr.S.D.N.Y.1993), which dealt with a similar situation, as support for this holding. *See also In re Dewsnup*, 908 F.2d 588, 590 (10th Cir.1990), *aff'd* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) ("Property abandoned under ... section [554] ceases to be part of the estate[ and, thus,] ... reverts to the debtor and stands as if no bankruptcy petition was filed.... Following abandonment, 'whoever had the possessory right to the property at the filing of bankruptcy again reacquires that right.'"). Therefore, excepting for the issues of value and perfection discussed above, the lone issue for decision is

whether the Cudas possess a security interest in the lawsuit.

**I. *Whether the lawsuit has already been settled and the claims therein reduced to proceeds, thereby rendering unenforceable any security interest that the Cudas might have in the claims?***

■ Before proceeding to determine whether the Cudas possess a security interest in the lawsuit, the Court shall dispose of this preliminary issue, which was raised by Chrysler in its response and objection but which it did not advance at the hearing on this motion. Chrysler asserts that both claims have been liquidated and reduced to proceeds because the lawsuit has already been settled, subject only to a ministerial approval of the proposed settlement by this Court. Because of said settlement, Chrysler asserts that, even accepting that the Cudas may have possessed a security interest in the breach of contract action, said interest is no longer enforceable because the proceeds from such action cannot be distinguished from the proceeds attributable to the ADD-CA action (which action Chrysler asserts the Cudas are not secured in). This argument must necessarily fail for the simple reason that the lawsuit has not yet been legally settled and, therefore, it has been neither liquidated nor reduced to proceeds. This Court's approval of the proposed settlement, which has not yet been granted, is much more than merely ministerial because, without it, said settlement has no legal effect whatsoever. *In re Blehm Land and Cattle Co.*, 71 B.R. 818, 823 (D.Colo.1987); *In re Masters, Inc.*, 149 B.R. 289, 291–93 (E.D.N.Y.1992) ("In general, debtors cannot bind their estates to compromises absent bankruptcy court approval"); *Reynolds v. C.I.R.*, 861 F.2d 469, 473 (6th Cir.1988) ("In bankruptcy proceedings, as distinguished

either established with certainty or the other parties concede such point.

**7.** 11 U.S.C. § 554(b) provides that "[o]n request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C.A. § 554(b) (West 1993).

**8.** This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). Furthermore, the Court may make a determination in this matter because it is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(A), and 157(b)(2)(K).

from ordinary civil cases, any compromise ... must be approved by the court as fair and equitable.").

## II. *Whether Mellon possessed a security interest in the remaining claims in the debtor's lawsuit under Pennsylvania law?*

■ Because the Cudas assert possession of a security interest in the lawsuit by way of subrogation to Mellon's rights, Mellon must have also possessed said security interest in the first instance. Thus, the Court shall next determine whether Mellon possessed a security interest in the lawsuit. Listed in Mellon's security agreement as collateral for its claim against the debtor is, *inter alia,* general intangibles and choses in action of the debtor. Lawsuits are choses in action and, pursuant to 13 Pa.C.S.A. § 9106, are also characterized as general intangibles for purposes of Article Nine of the Pennsylvania Commercial Code. *In re Bell Fuel Corporation,* 97 B.R. 193, 196 (Bankr.E.D.Pa.1989) (citing five cases for the proposition that a "lawsuit ... [is] within the scope of 'general intangibles' "). However, Article Nine "does not apply ... to a transfer in whole or in part of any claim arising out of tort." 13 Pa.Cons.Stat.Ann. § 9104(11) (Purdon 1984). One consequence of the above analysis is that Mellon possessed an Article Nine security interest in the two claims if they do not arise out of tort. *See* 13 Pa.C.S.A. § 9203(a) (ie., Mellon has such a security interest because it has satisfied the three requirements for attachment). Chrysler asserts an additional consequence; in particular, that if either of the claims arise out of tort, then Mellon cannot have had a security interest therein in any event because the significance of 13 Pa.C.S.A. § 9104(11) is that a creditor cannot possess a security interest in a tort claim, either inside or outside of Article Nine of Pennsylvania's Commercial Code.

Chrysler cites, as authority for its proposition, *Arkwright Mutual Insurance Co. v. Bargain City, U.S.A., Inc.,* 373 F.2d 701 (3rd Cir.1967), to the effect that a security interest in a tort claim is "beyond the pale of the Uniform Commercial Code of Pennsylvania, which excludes from its scope 'a transfer in whole or in part of ... any claim arising out of tort.' " *Id.* at 704 note 9. Chrysler, however, misconstrues *Arkwright* because the Third Circuit in that case was not confronted with a consensual security interest in a tort claim but rather an equitable lien therein. The Third Circuit ultimately determined that (a) equitable liens in tort claims were enforceable under the Bankruptcy Act precisely because means did not exist to perfect legal liens therein, *Id.,* (b) nevertheless, an equitable lien was not enforceable unless a creditor informed both other creditors and the court of its existence, *Id.* at 705–06, and (c) the equitable lien asserted by the creditor in *Arkwright* was unenforceable because that creditor had failed to notify the other creditors and the court of its purported equitable lien. *Id.* Furthermore, the language quoted by Chrysler appears to have been used by the Third Circuit merely as support for its position that the creditor in *Arkwright* did not have any method by which it could have recorded a legal lien in a tort claim, thereby allowing the Third Circuit to initially recognize an equitable lien pursuant to provision in the Bankruptcy Act. *Id.* at 704 note 9. Importantly, and contrary to Chrysler's interpretation, the Third Circuit in *Arkwright* did not conclude that, because a security interest in a tort claim is outside of the coverage of Article Nine, a creditor may, therefore, not possess said interest in any event. The Third Circuit merely concluded that such an interest is outside of the scope of Article Nine.

Courts that have addressed the enforceability of an asserted consensual security interest in a tort claim are split as to the result. Authority exists to support Chrysler's contention that said interest is unenforceable in any event. *In re Monroe County Housing Corp., Inc.,* 29 B.R. 686, 688 (Bankr.S.D.Fla.1983) (§ 9–104 of Florida's version of the U.C.C. "precludes ... [one] from holding a security interest in" a claim that "arose as the result of a tort claim"); *Matter of Babco, Inc.,* 133 B.R. 286, 290 (Bankr.D.Conn.1991) (court concluded that one cannot possess a security interest in a tort claim under Connecticut law because such a claim is excepted from coverage under Article Nine of the U.C.C.). However, au-

thority also exists to the effect that such interest nevertheless may have utility because, although Article Nine is not applicable, the common law regarding assignment of interests applies in its stead. *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2nd Cir.1976) (the U.C.C. did not "'shatter[ ]' the preexisting New York law of assignment," and "the drafters of the Code specifically exempted tort claims as 'beyond the pale with respect to a statute devoted to commercial financing,' with the intention that 'the pre-Code common law of assignment or pledge will continue to apply'"); *see also In re OLM Associates*, 98 B.R. 271, 276 (Bankr.N.D.Tex.1989) (citing with approval *Ore Cargo* ). To this Court, the latter view seems to be at least equally plausible. If such view is accepted, and based upon this Court's review, albeit less than comprehensive, of the common law in Pennsylvania regarding assignment of interests, a security interest in a tort claim may very well be enforceable under certain circumstances. 3 *Pennsylvania Law Encyclopedia Assignments*, § 9 at 154–56 (although an unliquidated claim for damages for personal injuries may not be assigned, a right to damages for a tortious injury to property may be assigned) & § 57 at 193–94 (although "[t]he matter of assignments as security is now covered by [Article Nine of] the Uniform Commercial Code," certain transactions are excluded therefrom) (1957; supplement from 1959–1996). Fortunately, the Court need not further address this issue at this time because it finds that neither of the claims in the debtor's lawsuit· are appropriately characterized as tort claims. Therefore, Mellon possessed an Article Nine security interest in both of the claims, or in the entire remaining lawsuit. The Court's rationale for this finding follows.

## A. *The Breach of Contract Claim.*

▉▉▉ Although Chrysler concedes that one of the two remaining counts in the debtor's lawsuit pleads a breach of contract claim, Chrysler nevertheless contends that a breach of contract action cannot be encumbered by an Article Nine security interest under Pennsylvania law, citing as support for that proposition *Merchants National Bank of Mobile v. Ching*, 681 F.2d 1383, 1388–89 (11th Cir.

1982). However, Chrysler did not press this argument at the hearing on this motion. The Court views this omission as wise because *Merchants National Bank*, in fact, does not stand for the proposition offered by Chrysler, instead merely holding that a "claim ... for wrongful interference with the performance of ... [a] contract *sound[s] in tort* and[, therefore, is] not encompassed within the provisions relating to secured transactions under the UCC." *Id.* (the 11th Circuit also noted that a "claim for lost profits [ (ie., tortious claim for wrongful interference with performance of a contract) is one which] cannot find its basis in the contract[, but nevertheless] ... is one for damages arising out of a breach of contract"). The court in *Merchants National Bank* did not hold that actions for breach of a contract, apart from tortious interference claims based on that contract, generally constitute tort actions that cannot be the subject of recognizable security interests under Article Nine of the Uniform Commercial Code. *Merchants National Bank* is consistent with the law in Pennsylvania, where a claim for interference with a business relationship "is a tort long recognized by the Courts of the Commonwealth of Pennsylvania." *Chrysler Credit Corporation v. B.J.M., Jr., Inc.*, 834 F.Supp. 813, 843 (E.D.Pa.1993) (citing several cases). Importantly, however, "[w]here a defendant's breach of his contract with ... [a] plaintiff has only an incidental consequence of affecting plaintiff's business relationships with third persons, an action lies only *in contract* for defendant's breaches, including any recoverable consequential damages. *Id.* (citing several cases). Thus, in Pennsylvania as well as in the Eleventh Circuit, an action based upon a contract which cannot be characterized as one for tortious interference is a contract action rather than a tort action. Chrysler does not cite additional authority for its proposition on this point because, the Court suspects, none exists. Rather, that a creditor's security interest in a contract action is enforceable under Article Nine of Pennsylvania's Commercial Code is a point that is generally accepted. Chrysler concedes that the debtor's remaining breach of contract claim is not for tortious interference

because, according to Chrysler itself, a tortious interference claim was originally included in count III of the debtor's suit against Chrysler and it was subsequently dismissed on summary judgment. Therefore, this Court finds that said claim is a contract action and, as such, it was subject to Mellon's Article Nine security interest.[9]

**B.** *The Claim under the "Automobile Dealers Day in Court Act."*

█ The "Automobile Dealers Day in Court Act," which is set out formally at Chapter 27 of Title 15 of the United States Code and entitled "Automobile Dealer Suits Against Manufacturers," was enacted in 1956 by Congress

> to supplement the antitrust laws of the United States, in order to balance the power ... [then] heavily weighted in favor of automobile manufacturers, by enabling franchise automobile dealers to bring suit in the district courts of the United States to recover compensatory damages sustained by reason of the failure of automobile manufacturers to act in good faith in complying with the terms of franchises or in terminating or not renewing franchises with their dealers.

H.R.Rep. No. 2850, 84th Cong., 2nd Sess., *reprinted in* 1956 *U.S.Code Cong. & Admin.News* 4596, 4596 (1956). As the legislative history makes clear, the balance of power was heavily weighted in favor of automobile manufacturers because of their "superior economic position which ... [they] retain[ed] by threat of franchise termination." *Id.* at 4598 (citing *Bigness and Concentration of Economic Power—A Case Study of General Motors Corp.*, S.Rep. No. 1879, 84th Cong., 2nd Sess. 79). The manufacturers retained the ability to threaten franchise termination because dealers were desirous of accepting "one sided contracts" with the manufacturers in return for "the right to deal in the product of the manufacturer." *Id.* at 4599–600 (citing *Ford Motor Co. v. Kirkmyer Motor Co.*, 65 F.2d 1001

(4th Cir.1933)). The one sided nature of these contracts routinely precluded dealers from *effectively* bringing suit in district courts for grievances relating to such agreements because, "[w]ith few exceptions, the courts ... [would] sustain[ ] the manufacturer's interpretation of the agreement, and the courts ... [would] h[o]ld that dealers fail[ed] to state a cause of action when suit ... [was] brought on the agreement alone." *Id.* at 4599 (citing S.Rep. No. 1879, 84th Cong., 2nd Sess. 79). Examples of the manufacturers' interpretation of franchise agreements are contained in an excerpt from a congressional study of General Motors Corporation, wherein it was reported that

> [i]n various suits in the past, General Motors has characterized its dealer franchise as follows:
>
> 1. That it does not constitute a legal contract;
>
> 2. That it lacks mutuality, and represents no legally enforceable obligation on the part of the seller to sell or on the part of the dealer to buy;
>
> 3. That it provides that the dealer shall perform to the satisfaction of the seller, and that the question of satisfaction is for the seller alone to determine;
>
> 4. That no damages are recoverable by the dealer since loss of profits was not contemplated by the parties;
>
> 5. That it is unenforceable and void because of indefiniteness, uncertainty, and lack of consideration; [and]
>
> 6. That, if valid, the agreement gives the factory the right to terminate at will.

Id. at 4598–99. Armed with the knowledge that "courts ... [were] reluctant to impose a condition of good faith on the part of the manufacturer" when those courts were "confronted with express provisions [inconsistent with such a condition] in the dealer's franchise [agreement], manufacturers subjected automobile dealers "to economic duress and

---

**9.** Chrysler also asserts that the Cudas have not suggested a method whereby the breach of contract action could be separated from the ADDCA action in the event that only one, but not both, of the claims could have been subjected to an Arti-

cle Nine security interest. The Court need not resolve this issue, of course, because it finds that both claims are non-tort claims that are subject to Mellon's Article Nine security interest.

intimidation," which is directly counter to the obligation of good faith otherwise required of both parties as set forth in the common law of contracts." *Id.* at 4599.

The ADDCA "assures the dealer an opportunity to secure a judicial determination, irrespective of the contract terms, as to whether the automobile manufacturer has failed to act in good faith in performing or complying with any of the provisions of his franchise or in terminating, canceling, or not renewing his franchise." *Id.* at 4600.[10] "Good faith" under the ADDCA is targeted such that the parties to a franchise agreement are obligated to refrain from "coercion, intimidation, or threats of coercion or intimidation" with respect to each other. 15 U.S.C.A. § 1221(e) (West 1996).[11] The ADDCA accomplishes the goal of providing all dealers with a means for recovery against a manufacturer regardless of one sided terms that may render an agreement otherwise unenforceable by defining "franchise" as a "written agreement or contract ... which *purports* to fix the legal rights and liabilities of the parties." 15 U.S.C.A. § 1221(b) (West 1982).[12]

Based upon a reading of the ADDCA and an examination of the accompanying legislative history, this Court is convinced that an action thereunder is, without question, one that is upon the contract and not grounded in tort law. The legislative history clearly reveals that Congress (a) was concerned with the imbalance of power between automobile manufacturers and dealers and, in particular, the impact that said imbalance had on the contractual bargaining process between the two, and (b) sought to remedy said imbalance by denying to manufacturers, at least in the limited context of suit under the ADDCA, the myriad of common law defenses to enforcement of franchise contracts. With respect to the remedy of the ADDCA, this Court agrees that "[t]he statute may be viewed as writing into every dealer franchise agreement a term that the manufacturer will not [ (a) perform or comply with the other terms of the agreement, or (b) ] terminate [or cancel] the relationship[,] in bad faith." *Bateman v. Ford Motor Company*, 302 F.2d 63, 66 (3rd Cir.1962) (citing at footnote 6 as support for this view excerpts from a senate debate on the ADDCA). Because the ADDCA's targeted definition of good faith is most certainly covered under the more broadly defined commercial concept embodied in the common law, violations of which are remedied by actions upon the contract, it only makes sense that an action under the ADDCA must also be categorized properly as one upon the contract. Moreover, this conclusion is not qualified in any way because of the fact that actions may be brought under the ADDCA upon agreements that potentially may not be enforceable otherwise by courts under the common law of contracts.[13] This is because actions upon

---

**10.** 15 U.S.C. § 1222 provides, in pertinent part, that:

> An automobile dealer may bring suit against any automobile manufacturer ... [to] recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the *terms or provisions of the franchise*, or in terminating, canceling, or not renewing *the franchise* with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.

15 U.S.C.A. § 1222 (West 1982) (emphasis ours).

**11.** 15 U.S.C. § 1221(e) provides that:

> The term 'good faith' shall mean the duty of each party *to any franchise,* and all officers, employees, or agents thereof *to act in a fair and equitable manner toward each other* so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C.A. § 1221(e) (emphasis ours).

**12.** 15 U.S.C. § 1221(b) provides that:

> The term 'franchise' shall mean the *written agreement or contract* between any automobile manufacturer engaged in commerce and any automobile dealer which purports *to fix the legal rights and liabilities of the parties to such agreement or contract.*

15 U.S.C.A. § 1221(b) (emphasis ours).

**13.** This situation may occur because the obligation of good faith under the ADDCA (ie., the additional "term") is incorporated into every "purported" agreement. Therefore, every dealer will be able to potentially recover for a manufacturer's alleged violations of the targeted obligation of good faith regardless of whether such agreement is otherwise enforceable by a court.

agreements ultimately determined by courts not to be enforceable for one reason or another are nevertheless actions upon such agreements and *not tort actions*.

The case authority that Chrysler cites for a contrary position is actually consistent with this Court's position. First, Chrysler correctly cites *Globe Motors, Inc. v. Studebaker–Packard Corporation*, 328 F.2d 645 (3rd Cir.1964), to the effect that the ADDCA "did not provide a new remedy for breach of contract but created a new cause of action." *Id.* at 646. However, the Third Circuit in *Globe Motors* was faced with an argument of a dealer "that the term 'lack of good faith' [in the ADDCA] should be liberally construed and not confined to the context of coercion and intimidation." *Id.* at 647. The Third Circuit disposed of this argument in the negative by concluding that "[a]n indispensable element of the statutory [ (ie., ADDCA) ] cause of action is not the lack of good faith in the ordinary sense but a lack of good faith in which 'coercion, intimidation or threats' thereof are at least implicit." *Id.* at 646–47 (also citing, *inter alia, Milos v. Ford Motor Company*, 317 F.2d 712, 715 (3rd Cir.1963), as support for its position). Thus, the Third Circuit in *Globe Motors*, when it stated that the ADDCA did not provide a new remedy for breach of contract, merely meant that the ADDCA would not address breaches of the common law duty of good faith but rather would remedy only a breach of a much narrower obligation of good faith. The "new cause of action" referred to in *Globe Motors* is that cause of action provided by the ADDCA for breach of the additional term (ie., obligation of good faith) written into every franchise agreement. Therefore, the Third Circuit's statements and decision in *Globe Motors* are consistent with (a) that court's prior statement in *Bateman* that the ADDCA "may be viewed as writing into every dealer franchise agreement a[n additional] term," and (b) this Court's holding that an action under the ADDCA is one that is upon the franchise contract and not grounded in tort law.

Second, Chrysler correctly cites *Lewis v. Chrysler Motors Corporation*, 332 F.Supp. 1202 (E.D.Mo.1971), for the proposition that "[t]he purpose of the Act [ (ie., ADDCA) ] was to ... [give] dealers ... a cause of action over and above common law remedies." *Id.* at 1204. However, the vehicle that Congress chose for provision of the new cause of action was inclusion in every franchise contract of an additional term. That term is even included in agreements that potentially may not be enforced otherwise by courts under the common law of contracts; ie., those contracts for which "common law remedies ... had theretofore been virtually non-existent." *Id.* Therefore, the proposition in *Lewis* is not inconsistent with either *Bateman* or this Court's holding. Furthermore, this rationale also demonstrates the consistency between both *Bateman* and this Court's holding, on the one hand, and Chrysler's citation to *Alfieri v. Willys Motors, Inc.*, 227 F.Supp. 627 (E.D.Pa.1964), for the proposition that the ADDCA is designed "to assure a dealer the opportunity to secure a judicial determination irrespective of contract terms, as to whether the automobile manufacturer has failed to act in good faith in performing or complying with any of the provisions of its franchise," *Id.* at 629–30, on the other hand.

Third, Chrysler correctly cites *Salco Corporation v. General Motors Corporation*, 517 F.2d 567 (10th Cir.1975), to the effect that the ADDCA "enables ... [a court] to look beyond the actual terms of the franchise agreement if acts of coercion or intimidation amounting to unfair business practices are established." *Id.* at 572 note 6. Given the text of the opinion that accompanies this footnote, the Tenth Circuit seems to imply that it can ascertain certain of the terms of a contract independent of the plain language embodied therein if acts of coercion or intimidation are such that they "would override the contractual undertaking." While this Court can neither be certain as to what the Tenth Circuit meant by this statement nor the accuracy of the Tenth Circuit's intention, this Court is nevertheless quite certain that said statement is not inconsistent with the Third Circuit's proposition that the ADDCA supplies to every franchise agreement the term obligating the parties thereto to refrain from acts of coercion or intimidation. Nothing in the Tenth Circuit's statement, either in its content or in the context in which it was

made, evidences any inconsistency with either *Bateman* or this Court's holding herein.

Finally, this Court absolutely cannot agree with Chrysler's contention that, because "statutory claims for relief arising under other 'anti-trust laws of the United States' may be characterized as claims sounding in 'tort'[,] the *same* cannot but be said of the ADDCA." Chrysler's Supplementary Response and Objection to Movant's Motion (October 17, 1996), at page 10. This Court recognizes (a) that the ADDCA was enacted "to supplement the antitrust laws of the United States," (b) perhaps that actions proscribed under other antitrust measures also implicate the ADDCA as well, and (c) that other antitrust measures are generally characterized as tort claims. Nevertheless, it does not logically follow that Congress must have intended to provide yet another tort cause of action for redress of unfair trade practices when it enacted the ADDCA. That Congress instead resorted to contract measures as a means to attack the power imbalance is at least equally plausible, especially given the legislative history accompanying the statute. Based upon the above analysis, this Court finds that Congress did, in fact, intend to create an action based upon the contract and not in tort.

■ Because this Court finds that an action under the ADDCA is one properly characterized as on the contract and not in tort, said action is not subject to the exclusion of 13 Pa.C.S.A. § 9104(11). Therefore, an ADDCA action is susceptible to encumbrance by a consensual Article Nine security interest in Pennsylvania, and Mellon was secured by, *inter alia*, the debtor's action under the ADDCA. Therefore, if the Cudas may properly assert in this bankruptcy case their subrogation right to the position of Mellon pursuant to § 509(a), then the Cudas will presently possess a security interest in the lawsuit.

### III. Whether the Cudas may properly assert in this bankruptcy case their subrogation right to the position of Mellon pursuant to § 509(a)?

Section 509(a) provides the following:

Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

11 U.S.C.A. § 509(a) (West 1993). The Cudas assert that they are subrogated to the rights of Mellon because they (a) were secondarily liable on the claim of Mellon against the debtor, and (b) paid said claim in full. Chrysler apparently concedes that the Cudas were codebtors on the claim of Mellon, and that they paid said claim. Chrysler nevertheless maintains that the Cudas may not be subrogated to the rights of Mellon because (a) subrogation is an equitable remedy and the equities in this case do not favor subrogation by the Cudas, and (b) pursuant to § 509(b)(1)(C), subrogation is not possible in this case because the Cudas' claim for reimbursement should be subordinated under 11 U.S.C. § 510. The Court disagrees with both of these contentions, which will be addressed forthwith.

■ Chrysler, in support of its assertion that subrogation is an equitable remedy, cites several cases that state that a "prerequisite[ ] of *equitable subrogation* ... [is that s]ubrogation must not work any injustice to the rights of others." *In re Flick,* 75 B.R. 204, 206 (Bankr.S.D.Cal.1987); *In re Four Star Construction Co.,* 151 B.R. 817, 821 (Bankr.N.D.Ohio 1993); *Matter of DiSanto & Moore Associates, Inc.,* 41 B.R. 935, 938 (N.D.Cal.1984). The courts in these cases apparently believe either (a) that the remedy of equitable subrogation, which is a state law remedy independent of bankruptcy law, *Matter of Topgallant Lines, Inc.,* 154 B.R. 368, 382 (S.D.Ga.1993) ("equitable subrogation ... involves state subrogation law"); *In re Spirtos,* 103 B.R. 240, 245 (Bankr.C.D.Cal. 1989) ("[e]quitable subrogation ... should not be confused with the subrogation rights specifically set forth in section 509"), is nevertheless identical to subrogation provided for in § 509, or (b) that, even if the two subrogation remedies are not identical, § 509(a) nevertheless also implicitly includes a requirement that "[s]ubrogation must not work any injustice to the rights of others."

This Court disagrees with both of these rationales for the following reasons.

 First, the requirements for equitable subrogation are not identical with § 509(a) if for no other reason than equitable subrogation requires full payment of a claim to which subrogation rights are asserted, *Flick,* 75 B.R. at 206; *DiSanto,* 41 B.R. at 938, whereas § 509(a) explicitly permits partial subrogation if only a portion of a claim is satisfied by a subrogee. 11 U.S.C.A. § 509(a) ("an entity . . . is subrogated to the rights of such creditor *to the extent* of such payment"); 3 *Collier on Bankruptcy,* para. 509.02 at 509–6 (Bender 1996); *see also Topgallant Lines,* 154 B.R. at 382 (citing *In re Mulberry Chesterton Inn, L.P.,* No. 91–4020, slip. op. at 24, 1992 WL 489775, (Bkrtcy. S.D.Ga.1992), to the effect that " '[s]ubrogation for partial payment under Section 509 is a deviation from the equitable doctrine of subrogation . . . which required full payment of the debt.' "). Furthermore, and as several other courts have properly pointed out, "the doctrine of equitable subrogation is separate and distinct from the subrogation rights afforded by section 509, and . . . section 509 is an additional, but not exclusive, remedy in bankruptcy." *Spirtos,* 103 B.R. at 245; *Topgallant Lines,* 154 B.R. at 382 (citing *Spirtos* approvingly); *In re Missionary Baptist Foundation of America,* 667 F.2d 1244, 1246 (5th Cir.1982) ("§ 509(a) establishes that co-debtors and sureties *are* subrogees, but it does not necessarily follow from this that others are *not* subrogees."). Finally, this Court does not believe that an additional requirement should, or even need, be added to § 509(a) to the effect that "[s]ubrogation must not work any injustice to the rights of others" because this concern is adequately dealt with by § 509(b)(1)(C). Section 509(b)(1)(C) provides, in pertinent part, that an "entity is not subrogated to the rights of . . . [a] creditor to the extent that . . . a claim of such entity for reimbursement or contribution on account of such payment of such

creditor's claim is . . . subordinated under section 510." 11 U.S.C.A. § 509(b)(1)(C) (West 1993). Section 510(c) provides for equitable subordination of a claimant's claim if inequitable conduct exists that would work an injustice to the rights of creditors. 11 U.S.C.A. § 510(c) (West 1993);[14] 3 *Collier on Bankruptcy,* para. 510.05[2] at 510–9, 10. Therefore, Chrysler's argument that the equities in this case do not favor subrogation by the Cudas shall be dealt with in the context of equitable subordination under § 510(c) rather than as an additional requirement under § 509(a). Chrysler is not affected by this holding, however, as it also contends that equitable subordination of the Cudas' reimbursement claim is appropriate under § 510(c).

 A bankruptcy court may assert its power of equitable subordination under § 510(c) if

(i) [t]he claimant . . . ha[s] engaged in some type of inequitable conduct[;]

(ii) [t]he misconduct . . . ha[s] resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and]

(iii) [e]quitable subordination . . . [is] not . . . inconsistent with the provisions of the Bankruptcy . . . [Code].

*Id.* (citing *Benjamin v. Diamond (In the Matter of Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977)); *In re Dan–Ver Enterprises, Inc.,* 86 B.R. 443, 448 (Bankr.W.D.Pa.1988) (citing numerous cases setting forth this "tri-parte test"). Chrysler maintains that such subordination is appropriate in this case for essentially two reasons. First, Chrysler alleges that the Cudas "deceived" the district court judge that presided over the debtor's lawsuit, the trustee, Chrysler, and the debtor's counsel in the district court action by "fail[ing] to bring . . . [the] alleged right of 'subrogation' to their attention . . . [, thereby] allowing a sham settlement of . . . [the debtor's] claims to proceed and the hard-won

---

**14.** 11 U.S.C. § 510(c) provides, in pertinent part, that:

[A]fter notice and a hearing, the court may—
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of

another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
(2) order that any lien securing such a subordinated claim be transferred to the estate. 11 U.S.C.A. § 510(c).

trial setting for those claims to be lost[ ] irretrievably." Chrysler's Response and Objection To Movant's Motion (August 30, 1996), at page 18. Second, Chrysler asserts that the Cudas' attempt to recover on administrative and general unsecured claims that they have also filed in this case is inequitable because said claims are merely an alternative means for recovering on their subrogated claim to reimbursement.

With respect to Chrysler's allegation of deception on the Cudas' part, Chrysler did not present any evidence of such deception at the hearing on this motion. Furthermore, the Cudas' counsel in this matter represented that the Cudas were not aware of any right to subrogation during the trustee's settlement negotiations with Chrysler, and that said counsel only informed the Cudas of such right subsequent to the culmination of said settlement negotiations. Although the Court cannot subordinate a creditor's claim under § 510(c) absent evidence demonstrating cause for such an action, the Court nevertheless also wishes to note that subordination would have been unlikely even had Chrysler proven its allegations of said deception. That is because such deception, in order to be actionable under § 510(c), must also have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the Cudas, neither of which this Court can detect. To the contrary, the Cudas' actions appear to have benefitted unsecured creditors because, by satisfying the claim of Mellon, the Cudas have removed from any future distribution a potential undersecured claim. Moreover, although the timing of the Cudas' assertion of their subrogation right may have been unfortunate from the perspective of those involved in the settlement negotiation process regarding the district court action, such right was nevertheless timely asserted in this bankruptcy case. Importantly, however, the alleged untimeliness of said assertion by the Cudas has no impact upon other creditors in this case; put another way, the unsecured creditors would have been negatively impacted by the introduction of the Cudas' subrogation rights even had they been asserted prior to the aforementioned settlement negotiations. Therefore, the timing of the assertion of said subrogation rights, even if done with an intent to deceive, did not affect the other creditors in this case. The Court also fails to see how such alleged deception could have provided the Cudas with an unfair advantage vis-a-vis these other creditors. Rather, the only advantage enjoyed by the Cudas vis-a-vis the other creditors is an advantage that would have existed even if the alleged deception had not been perpetrated. The Court is of the view, therefore, that if said deception can be established by Chrysler at some future time, it will only be actionable as a potential defense to future litigation in the district court action. Such deception simply has not affected the equities in this bankruptcy case.

■ The Court will not accept Chrysler's second argument for two reasons. First, Chrysler has not established that the substance of the Cudas' administrative and general unsecured claims is identical to their claim for reimbursement for payment of Mellon's claim. In fact, the Cudas' representations in other pleadings filed with this Court are inconsistent with Chrysler's assertion. In their Motion No. 96–1323–M the Cudas merely assert an unsecured claim of "$562,072.68 for loans made to Northview Motors prior to the filing of the Chapter 11 petition." Likewise, in their Motion No. 96–1322–M the Cudas assert an administrative claim of $201,000.00 for rent and real estate taxes on rental property occupied by the debtor during the year leading up to conversion of this case from Chapter 11. Absent from both motions is any mention of the claim for reimbursement. Furthermore, the total amount of claims asserted in these two motions surpass the amount of the Cudas' claim for reimbursement. Second, even if the Cudas' administrative and general unsecured claims are substantively identical to their claim for reimbursement, that fact, by itself, does not evidence inequity. Chrysler cites language in footnote 4 of *In re Trasks' Charolais*, 84 B.R. 646 (Bankr.D.S.D.1988) to the effect that "[a] putative subrogee's previous assertion of an inconsistent legal theory, such as a proof of claim for reimbursement and contribution, could be construed as a possible ground for the denial of subrogation due to the injustice to other creditors." *Id.* at 650

note 4 (citing *DiSanto,* 41 B.R. at 940). Importantly, however, the courts in both *Trasks' Charolais* and *DiSanto* noted that inequity would result only if creditors were harmed by the previous assertion of an inconsistent legal theory, such as might happen if another creditor were to have extended credit to the debtor during the period subsequent to a party's filing of a claim but prior to its asserted right of subrogation. *Trasks' Charolais,* 84 B.R. at 650 note 4; *DiSanto,* 41 B.R. at 940. Because Chrysler has neither alleged facts establishing this form of inequity, nor any facts from which another form of inequity regarding the creditors in this case may be established, *Trasks' Charolais* and *DiSanto* are inapposite to this case. Of course, if the Cudas' administrative and general unsecured claims are substantively identical to their claim for reimbursement, they may not receive recovery for both sets of claims. 11 U.S.C. § 509(b)(1)(A); 11 U.S.C. § 502(e)(1)(C). Additionally, the Court would presume, in that event, that they have elected to assert their subrogation rights and forego their filed claims. *Trasks' Charolais,* 84 B.R. at 650.

Therefore, Chrysler has not produced any reason why this Court should exercise its discretionary power to equitably subordinate the Cudas' claim for reimbursement under § 510(c). Furthermore, the Court is not itself aware of any reason why it should exercise said power *sua sponte.* Therefore, § 509(b)(1)(C) is inapplicable to the Cudas' circumstances and they are subrogated to the rights of Mellon pursuant to § 509(a).

### CONCLUSION

Because the debtor's action under the ADDCA is one properly characterized as a contract action rather than grounded in tort law, said action is susceptible to encumbrance by a consensual security interest under Article Nine of Pennsylvania's Commercial Code. The debtor's other claim in its lawsuit against Chrysler, a breach of contract action, may also be the subject of an Article Nine security interest in Pennsylvania. Mellon held an Article Nine security interest in the debtor's lawsuit against Chrysler at the time that the Cudas satisfied Mellon's claims

against the debtor. Because the Cudas were secondarily liable on the debtor's obligation, and in light of the fact that their claim for reimbursement on account of the payment of said obligation cannot be subordinated under § 510, they are subrogated to the rights of Mellon under § 509(a), including the security interest in the lawsuit against Chrysler. The lawsuit must be abandoned to the Cudas if (a) the value of their security interest therein is equal to their claim for reimbursement, and (b) their security interest therein is immune from avoidance by the trustee. This conclusion is dictated by the fact that said lawsuit would not then generate any funds for unsecured creditors and would, therefore, be "of inconsequential value and benefit to the estate."

With respect to whether (a) the Cudas' security interest is actually valued at the amount of their reimbursement claim, and (b) the Cudas' security interest is immune from avoidance by the trustee (ie., whether it was perfected by Mellon at the time when this case was commenced), the trustee and Chrysler are given **ten (10) days** from the date of this opinion to inform this Court as to whether they wish to pursue these particular issues. If neither party timely expresses an interest in contesting said issues, the Cudas' motion for abandonment will then automatically be **GRANTED** and the trustee will be directed to turn over to the Cudas the lawsuit against Chrysler. An appropriate order will be entered.