Edward C. CORCORAN and Susan
Corcoran, Plaintiffs,

v.

LAND O' LAKES, INC., Defendant.

No. C 96–3135–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Feb. 12, 1999.

William G. Enke, C. Joseph Coleman, Coleman & Enke, Fort Dodge, IA, for plaintiffs.

John F. Lorentzen, Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., Des Moines, IA, for defendant.

**MEMORANDUM OPINION AND OR- DER REGARDING DEFEN- DANT'S MOTION FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................1141
    A. Procedural Background ...............................................1141
    B. Factual Background ..................................................1142
II. LEGAL ANALYSIS ........................................................1144
    A. Standards For Summary Judgment.....................................1144
    B. Foreclosure Of The Corrorans' Right To Prosecute ..................1147
        1. Security interest in a lawsuit ...................................1147
        2. The state court's foreclosure judgment ..........................1148
    C. Tortious Interference ..............................................1149
        1. Theories and elements of the tort ...............................1149
        2. The distinction between the theories ............................1152
        3. The record on "improper purpose" here ...........................1152
    D. Breach Of Fiduciary Duty ...........................................1154
        1. Fiduciary relationships under Iowa law ..........................1154
        2. Arguments of the parties ........................................1154
        3. Inferences of a fiduciary relationship ..........................1155
    E. Punitive Damages ...................................................1155
III. CONCLUSION ............................................................1156

With as much spirit, and indeed with as much courtesy, as knights might have entered the lists for a tournament, counsel for the parties presented their arguments on the defendant's motion for summary judgment in this case. Counsel jousted over a variety of issues, including whether a third party's foreclosure of a security interest in personal property foreclosed the plaintiff's right to pursue tort and contract claims against the defendant; the requirements for proof of "improper purpose" to support claims of tortious interference with existing and prospective contracts; indicia of a fiduciary relationship; and availability of punitive damages. For every well-aimed attack there seemed to be a prompt parry and riposte, making the question of whether the defendant should prevail on its motion for summary judgment a very close one.

## I. INTRODUCTION

### A. Procedural Background

Plaintiffs Edward and Susan Corcoran filed their complaint in this matter on Sep-

tember 16, 1996, and an amended and substituted complaint on May 27, 1998, against defendant Land O' Lakes, Inc., asserting claims arising from the breakdown of an "Independent Contractor Farrow to Feeder Pig Agreement" between the parties. Count I of the Corcorans' complaint asserts breach of contract; Count II alleges intentional interference by Land O' Lakes with contracts and prospective contractual relationships that the Corcorans had with their lender, Norwest Bank of Fort Dodge, Iowa; and Count III alleges breach of fiduciary duty by Land O' Lakes. In addition, in "Count IV" of their complaint, the Corcorans pray for punitive damages on their claims of tortious interference and breach of fiduciary duty.

Land O' Lakes answered the original complaint on November 27, 1996, then filed an amended and substituted answer and counterclaim on May 27, 1998. Land O' Lakes ultimately filed an answer to the Corcorans' amended and substituted complaint on June 18, 1998. In its answer to the amended and substituted complaint,

Land O' Lakes denied each of the Corcorans' claims, asserted several affirmative defenses, and also alleged a counterclaim for breach of contract by Edward Corcoran. Edward Corcoran answered Land O' Lakes' counterclaim on June 25, 1998, denying the counterclaim and asserting various affirmative defenses.

Now before the court is Land O' Lakes' August 26, 1998, motion for summary judgment on the Corcorans' claims. First, Land O' Lakes seeks summary judgment on the Corcorans' tortious interference claim on the ground that there is "insufficient evidence" of an improper purpose to support the claim. Land O' Lakes next seeks summary judgment on the Corcorans' breach-of-fiduciary-duty claim, on the ground that there is "insufficient evidence" of a fiduciary relationship between the parties to support that claim. Land O' Lakes also argues that, as a matter of law, the Corcorans cannot recover punitive damages in the absence of viable tort claims. Finally, Land O' Lakes attempts to deal a *coup de grâce* to the Corcorans' entire complaint by asserting that Norwest Bank's foreclosure of its security interest in the Corcorans' collateral on certain loans—which collateral Land O' Lakes contends included the Corcorans' claims in this litigation—deprived the Corcorans of the right to prosecute this action. Land O' Lakes does not, however, seek summary judgment on its own breach-of-contract counterclaim. The Corcorans resisted summary judgment on each of the grounds asserted on September 24, 1998, and filed various addenda to their resistance, including a supplemental brief filed on January 25, 1999. Although Land O' Lakes resisted the Corcorans' request for leave to file the supplemental brief as an untimely attempt to assert new legal arguments, the court will permit the filing of the supplemental brief, recognizing that Land O' Lakes had the opportunity to address any "new" legal arguments during oral arguments on the motion for summary judgment.

The court heard oral arguments on Land O' Lakes' motion for summary judgment on February 5, 1999. Plaintiffs Edward and Susan Corcoran were represented by William G. Enke, who presented the Corcorans' arguments, and C. Joseph Coleman, Jr., of Coleman & Enke in Fort Dodge, Iowa. Land O' Lakes was represented by John F. Lorentzen of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in Des Moines, Iowa. The arguments were unusually spirited, informative, and compelling. This matter is now fully submitted.

### B. Factual Background

The court will discuss here only the nucleus of undisputed facts pertinent to the present motion for summary judgment. In its legal analysis, the court will address where necessary the Corcorans' assertions of genuine issues of material fact that may preclude summary judgment on their claims.

The parties agree that on December 12, 1991, Edward Corcoran and Land O' Lakes entered into an "Independent Contractor Farrow to Feeder Pig Agreement" (the Agreement) under which Land O' Lakes owned swine breeding stock and placed it with Corcoran. Corcoran was to service the stock and their offspring for the purpose of rearing feeder pigs. In addition to the stock, Land O' Lakes provided the feed, veterinarian services and medical supplies, and a service manager to work with Corcoran for "technical support." Corcoran owned the premises and facilities at which Land O' Lakes' stock was kept and provided the labor to care for the stock. Corcoran also provided utilities, maintenance and repairs, taxes, insurance, and waste disposal. Corcoran was to be paid according to the number of pigs he raised to feeder weight. The Agreement was for a term of ten years. The parties agree further that there was no negotiation of terms of the Agreement or of the price per pig Corcoran was to be paid; Corcoran simply had the option to

accept or reject the contract at the price offered.

Land O' Lakes maintains, and the Corcorans do not dispute, that its relationship with producers such as Corcoran was contractual, not a partnership. On this point, the Agreement specifically provides as follows:

> [Corcoran] is an independent contractor as contemplated by the Agreement and nothing herein or hereunder shall be construed to make [Corcoran] a servant, agent, employee, partner or joint venturer of or with [Land O' Lakes].

Agreement, p. 11, ¶ 8. The Agreement granted Land O' Lakes certain rights with regard to management of the livestock in Corcoran's care. For example, Land O' Lakes had the right to direct Corcoran with respect to all matters relating to the care of the livestock; Land O' Lakes was required to "provide continuing counsel and advice in the care and production of the livestock," Agreement, p. 3, ¶ 3; and Corcoran was required to "take any action reasonably requested by [Land O' Lakes] to raise the livestock in accordance with the standards of [Land O' Lakes] which may be in effect from time to time." Agreement, p. 6, ¶ D. 1.

Although the parties dispute precisely how much Corcoran was expected to rely upon them, Land O' Lakes provided Corcoran with some cash flow projections prior to his entering into the Agreement. Land O' Lakes also provided layout specifications. Corcoran obtained financing for his performance of the Agreement from Norwest Bank in Fort Dodge, Iowa. Land O' Lakes guaranteed part of Corcoran's loan, approximately $28,000.

Land O' Lakes was obligated to deliver to Corcoran a herd of approximately 312 breeding sows and 17 boars and was to maintain approximately those numbers of animals throughout the contract term. Land O' Lakes has two other facilities built about the same time as Corcoran's, to the same specifications, also involving farrow to feeder pig operations of approximately 300 head. The parties agree that improper breeding, sow condition, overfeeding, or underfeeding could result in long-term damage to the productivity of a herd.

Land O' Lakes did not select or transport the hogs to Corcoran's facility. Nor was Corcoran involved in buying, selecting, or shipping the hogs. Instead, the hogs were selected and delivered by a breeding stock buyer, such as Dekalb Swine Breeders or PIC. Corcoran chose to have his operation supplied by Dekalb. Corcoran would also tell Dan Wetherell, a Land O' Lakes service representative, when he was running short of stock, such as gilts or boars, and Wetherell would then arrange for the shipment of additional stock. Wetherell supervised Corcoran's operation until some time in May or June of 1996. The parties agree that before leaving, Wetherell had not advised Land O' Lakes to discontinue Corcoran's contract.

During the period the Agreement was in force, Corcoran's herd suffered three outbreaks of Porcine Reproductive and Respiratory Syndrome virus (PRRS). The first occurred in 1994, with subsequent outbreaks in late 1995 and early 1996. After the second and third outbreaks of PRRS, there were discussions between Corcoran and Land O' Lakes representatives about depopulating his farm and repopulating with PIC stock. However, those discussions never came to fruition. Instead, after the third outbreak of PRRS, Corcoran's operation was in serious financial difficulty. Also during the spring of 1996, there were discussions between Corcoran and Land O' Lakes about changing the nature of his operation from production of feeder pigs to raising other stock, and discussions about a new contract to replace the 1991 Agreement. Although Land O' Lakes represents that the new contract would have been better for Corcoran, and would at least have enabled him to continue operations, because it paid Corcoran according to the number of pigs

in his care as well as the number raised to feeder weight, not just according to the number of pigs Corcoran raised to feeder weight, Corcoran contends that the new contract was in fact worse for him under most projections. The new contract was never signed.

At about the same time discussions concerning the new contract were underway, Land O' Lakes stopped delivering new stock to Corcoran's facility. Land O' Lakes contends that this was because the PRRS outbreak was not under control and it would have been pointless to ship PRRS negative stock into Corcoran's facility. Land O' Lakes also contends that there was no point in delivering stock while there was no decision on what changes would be made to Corcoran's operation. Corcoran contends Land O' Lakes' failure to deliver stock at this time was an attempt to pressure him into accepting the new, less beneficial contract and that shipments of stock resumed when his lawyer contacted Land O' Lakes and demanded shipments.

In any event, in early 1996, Norwest Bank became concerned about the state of its loans to Corcoran. Discussions ensued among Corcoran and representatives of Norwest, including Sid Bodholdt and John Taets, and representatives of Land O' Lakes, including Maurie Cashman, about ways to make Corcoran's operation "cash flow." However, by May of 1996, no new plan had been developed, the projected cash flows under the existing contract indicated that Corcoran would not be able to meet his loan payments, and Norwest declared Corcoran's loans in default. Corcoran ceased operations in August of 1996. Norwest obtained a decree of foreclosure and judgment in rem against Corcoran on May 27, 1997, in the amount of $304,884.85. The Corcorans filed a voluntary petition in bankruptcy in February of 1997, originally under Chapter 7, but the proceeding was subsequently converted into one under Chapter 13.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R.CIV.P. 56 in a number of recent decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(a)–(c) (emphasis added).

Although Land O' Lakes has framed its motion for summary judgment in terms of there being "insufficient evidence" to support certain of the Corcorans' claims, a phrase that seems to invite the court to weigh the evidence and find it wanting, the trial judge's function at the summary judgment stage of the proceedings is *not* to weigh the evidence and determine the

truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp. .,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

Thus, the Corcorans' burden is not to come forward with sufficient evidence at this point to prevail on their claims; nonetheless, they must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. The Corcorans are required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED.R.CIV .P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. "[A] non-moving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Rose–Maston v. NME Hospitals, Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998); *Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997); *Ruby v. Springfield R–12 Pub. Sch. Dist.,* 76 F.3d 909, 911 (8th Cir.1996). Although

"direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

At oral arguments, Land O' Lakes asserted that the Corcorans' claims simply make no economic sense, and therefore should never reach a jury. As this court observed in *Firstar Bank v. Beemer Enters., Inc.,* 976 F.Supp. 1233 (N.D.Iowa 1997), although this "no economic sense" argument is unusual, such a ground for summary judgment was recognized by the United States Supreme Court, in the context of antitrust litigation, in *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *Beemer Enters., Inc.,* 976 F.Supp. at 1234. This court found that while the Eighth Circuit Court of Appeals had considered this ground for summary judgment only in the context of antitrust cases, other circuit courts of appeals had found it applicable in a variety of other contexts. *See id.* at 1238–39 (citing cases). This court specifically concluded that "the 'economic sense' of the claims is particularly relevant where all claims arise in a commercial context," as was the case in *Beemer Enterprises* and is the case here. *Id.* at 1238.

In *Matsushita,* the Supreme Court wrote,

[I]f the factual context renders [non-movants'] claim implausible—if the claim is one that simply makes no economic sense—[non-movants] must come forward with more persuasive evidence to support their claim than would otherwise be necessary.

*Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. In *Matsushita,* the Supreme Court found summary judgment was appropriate, because "as presumably rational businesses, [defendants] had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners without corresponding gains." *Id.* at 595, 106 S.Ct. 1348. The Court found that the court of appeals below in *Matsushita* had failed to consider the absence of a plausible motive to engage in the allegedly illegal conduct, predatory pricing. *Id.* The Court explained,

> [T]he absence of a plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if [defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.

*Id.* at 596–97, 106 S.Ct. 1348. More recently, the Supreme Court returned to the "economic sense" theme first sounded in *Matsushita* in *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992):

> The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense *did not introduce a special burden on plaintiffs facing summary judgment* in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach a jury, a requirement that was not invented, but merely articulated, in that decision. *If the plaintiff's theory is economically senseless, no reasonable jury*

> could find in its favor, and summary judgment should be granted.

*Eastman Kodak Co.,* 504 U.S. at 468–69, 112 S.Ct. 2072 (emphasis added).

In *Beemer Enterprises,* this court noted that the Eighth Circuit Court of Appeals had distinguished between the implausibility of inferences from the non-movant's evidence and the *plausibility* of the movant's theory:

> Although the Eighth Circuit Court of Appeals did not mention *Matsushita* in the pertinent part of [a recent] decision, in reversing summary judgment in favor of defendants on RICO claims, the court cautioned that "'a party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial.'" *Handeen v. Lemaire,* 112 F.3d 1339, 1354 (8th Cir.1997) (quoting 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 104–05). This court reads *Handeen* in conjunction with *Matsushita* to require something more than the greater plausibility of the movants' evidence to establish entitlement to summary judgment: The non-movant's theory must be *implausible,* not just *less plausible* than the movant's, in light of the record as a whole before the movant is entitled to summary judgment.

*Beemer Enters., Inc.,* 976 F.Supp. at 1240.

In addition to its "no economic sense" argument, the court notes that much of Land O' Lakes' motion for summary judgment goes to the asserted lack of evidence of the requisite motive or purpose on Land O' Lakes' part that the Corcorans must establish in order to prevail on their claims. Taking a page from the standards for summary judgment in another context where the defendant's motivation is a central issue, employment discrimination, the court considers it appropriate to give particular deference to the non-movant when

proof of motive depends upon inferences drawn from circumstantial evidence. *Cf.,* *e.g., Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (requiring particular deference to the non-movant on summary judgment in discrimination cases, because such cases are based on inferences from circumstantial evidence of discriminatory motive); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996) (same); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995) (same).

With these standards in mind, the court turns to analysis of Land O' Lakes' grounds for summary judgment on the Corcorans' claims.

## B. Foreclosure Of The Corcorans' Right To Prosecute

The court takes up first the legal argument by Land O' Lakes that is meant to deal a death blow to the Corcorans' entire complaint, Land O' Lakes' assertion that, by foreclosing on the Corcorans' collateral, Norwest Bank also foreclosed the Corcorans' right to prosecute this action. If Land O' Lakes is correct, the court's analysis need proceed no further and all that remains for trial is Land O' Lakes' counterclaim against the Corcorans for breach of contract.

Land O' Lakes argues that the "collateral" securing the Corcorans' loans from Norwest included "[e]ach and every right of Debtor to the payment of money, whether such right to payment now exists or hereafter arises," and "[a]ll general intangibles of Debtor, whether now owned or hereafter acquired," and that this language is broad enough to grant a security interest in the claims the Corcorans have brought against Land O' Lakes in this lawsuit. Land O' Lakes argues further that the Judgment and Decree of Foreclosure that Norwest obtained against the Corcorans in May of 1997 established Norwest's right to possess and sell the collateral, leaving the Corcorans with only two rights over the collateral: a right to redeem, and a right to any surplus on the

sale of the collateral. Land O' Lakes contends, however, that the Corcorans were not left with any right to prosecute the causes of action presently before the court. The Corcorans respond that the petition and judgment in Norwest's foreclosure action demonstrate that relief was limited to the real estate collateral and liens on the real estate, although Norwest may retain a security interest in proceeds of any judgment the Corcorans may obtain in this action. The Corcorans also argue that by failing to object to recognition of the present action as an asset of the Corcorans' bankruptcy estate, Land O' Lakes is estopped to assert the very arguments based on Norwest's foreclosure that Land O' Lakes now offers.

### 1. Security interest in a lawsuit

■ Land O' Lakes is correct that the Corcorans gave Norwest a security interest in collateral including "[e]ach and every right of Debtor to the payment of money, whether such right to payment now exists or hereafter arises," and "[a]ll general intangibles of Debtor, whether now owned or hereafter acquired." Land O' Lakes is also correct that "general intangibles" under the Uniform Commercial Code (UCC) has been defined or construed to include lawsuits or claims therein. *See, e.g.,* IOWA CODE § 554.9106 (" 'General intangibles' means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money."); *Insurance Co. of N. Am. v. Della Indus., Inc.,* 998 F.Supp. 159, 162 (D.Conn.1998) (under the UCC, "general intangibles" include lawsuits); *In re Northview Motors, Inc.,* 202 B.R. 389, 395 (Bkrptcy.W.D.Pa.1996) ("Lawsuits are choses in action and, pursuant to 13 Pa.C.S.A. § 9106, are also characterized as general intangibles for purposes of Article Nine of the Pennsylvania Commercial Code."); *In re Bell Fuel Corp.,* 99 B.R. 602, 606 (Bkrptcy.E.D.Pa.) (a lawsuit is a chose in action to which a security interest in general intangibles ap-

plies), *aff'd,* 891 F.2d 281 (3d Cir.1989) (table opinion); *First Am. Bank Valley v. Hegstrom Co.,* 551 N.W.2d 288, 292 (N.D. 1996) ("Courts uniformly hold that, under the UCC, proceeds of an anticipated recovery from an impending lawsuit constitute general intangibles," citing cases, and holding that "[l]ogically, the proceeds of a resulting settlement agreement are also considered general intangibles"); *Claire Murray, Inc. v. Reed,* 139 N.H. 437, 656 A.2d 822, 824 (1995) (applying Massachusetts law, the UCC definition of intangibles includes lawsuits); *Parker Roofing Co. v. Pacific First Fed. Sav. Bank,* 59 Wash. App. 151, 796 P.2d 732, 735–36 (1990) (under Washington's UCC, a security interest in a debtor's general intangibles, including after-acquired assets, included proceeds from a lawsuit, even though the suit was not yet contemplated when the financing statement was filed).

However, the UCC in general—and Iowa's version of the UCC in particular—specifically excludes security interests in *tort* claims. Iowa Code § 554.9104(k) (Article Nine of the UCC "does not apply ... to a transfer in whole or in part of any claim arising out of tort"); *In re Northview Motors, Inc.,* 202 B.R. at 395 ("Article Nine 'does not apply ... to a transfer in whole or in part of any claim arising out of tort,'" and thus a bank's security interest did not apply to tort claims, but did apply to breach-of-contract claims); *Della Indus., Inc.,* 998 F.Supp. at 162 (UCC § 9–104(k) excludes security interests in tort claims); *Claire Murray, Inc.,* 656 A.2d at 824 ("The definition of general intangibles [under the UCC] does not include intangibles specifically excluded from article 9," such as "any claim arising out of tort," citing Mass.Gen.Laws Ann. ch. 106 § 9–104(k)); *In re Northview Motors, Inc.,* 202 B.R. at 396 (a security interest does not include tort claims, but does include contract claims); *In re Bell Fuel Corp.,* 99 B.R. at 608 (former UCC § 9–104(11) excludes tort claims from "general intangibles" under security agreements, but does not exclude "contract" claims). Indeed,

not only does the security interest not apply to the *tort* claim, it does not apply to the *proceeds* of a tort claim. *Della Indus., Inc.,* 998 F.Supp. at 165 (citing cases so holding). Therefore, although Norwest obtained a security interest in the Corcorans' breach-of-contract claim against Land O' Lakes, it did *not* obtain a security interest in the Corcorans' tort claims of tortious interference with contracts or prospective contractual relations and breach of fiduciary duty, nor did it obtain a security interest in the proceeds of those tort claims. *See Della Indus., Inc.* 998 F.Supp. at 162 (tortious interference is a tort claim to which Article Nine of the UCC does not apply); *In re Northview Motors, Inc.,* 202 B.R. at 396 (a security interest included contract claims, but did not include tortious interference claims); *see also Wilson v. IBP, Inc.,* 558 N.W.2d 132, 137 (Iowa 1996) (breach of fiduciary duty is an intentional tort). Hence, the Corcorans are not foreclosed from prosecuting their tort claims by foreclosure of Norwest's security interest in the Corcorans' "general intangibles."

However, the Corcorans' breach-of-contract claim is subject to Norwest's security interest, so the question of whether foreclosure of that security interest foreclosed the Corcorans' right to prosecute their breach-of-contract claim requires further analysis.

### 2. The state court's foreclosure judgment

■ Thus, the court turns next to the question of what effect the state court's foreclosure of Norwest's security interest, including a security interest in the Corcorans' breach-of-contract claim, has upon the Corcorans' right to prosecute that claim here. To resolve this issue, the court looks to the state court's Judgment and Decree of Foreclosure, Plaintiff's Exhibit 8.

The state court's Judgment is not, as the Corcorans would have it, restricted to a

foreclosure of Norwest's security interest in their real estate collateral. Although pages two through four of that Judgment are concerned with foreclosure of Norwest's security interest in real estate, the remainder of the Judgment is concerned with the "indebtedness secured by all inventory, equipment, farm products, and consumer goods and rights in payment and general intangibles all as more particularly described on the Security Agreements attached to the Bank's Petition." Judgment and Decree of Foreclosure, Plaintiff's Exhibit 8, p. 4, unnumbered fourth full paragraph. The state court then established the Bank's security interest in this "personal property" as "a first and superior lien . . . over the lien, title, or interest of the Corcorans." *Id.* at unnumbered fifth full paragraph. The court "foreclosed" the security interest for the full amount of the judgment and declared the judgment to be a "lien upon the personal property." *Id.* Thus, the state court established that Norwest has a lien upon the proceeds of the Corcorans' breach-of-contract claim in this lawsuit that is superior to the Corcorans' rights in such a judgment.

■■■ Land O' Lakes is incorrect, however, in asserting that the state court's Judgment deprived the Corcorans of the right to prosecute their breach-of-contract claim by ordering the sale of the collateral. The remainder of the state court Judgment does indeed order the seizure and sale at auction of the Corcorans' "personal property," without limitation, and application of the proceeds of the sale to the Corcorans' indebtedness to Norwest. *Id.* at page 5. However, as a matter of logic, this court reads the order for seizure and sale to be applicable only to the *tangible* personal property of the Corcorans, not to their intangible cause of action against Land O' Lakes. Thus, as this court reads the state court Judgment, the Corcorans'

breach-of-contract claim was not assigned or transferred to Norwest by foreclosure of Norwest's security interest in "general intangibles." Instead, Norwest obtained a first priority lien, superior even to the Corcorans' interest, in the proceeds of any judgment from the Corcorans' breach-of-contract claim against Land O' Lakes. *Id.*, p. 4, unnumbered fifth full paragraph. The Corcorans were not, however, deprived of the right to prosecute such a claim.

Therefore, Land O' Lakes' motion for summary judgment on all claims on the ground that the Corcorans are foreclosed from prosecuting those claims by Norwest's foreclosure of its security interest will be denied.[1]

### C. Tortious Interference

#### 1. Theories and elements of the tort

■■■ The Corcorans have alleged tortious interference by Land O' Lakes with both existing and prospective loan contracts between the Corcorans and Norwest Bank. Under Iowa law, a claim of tortious interference with an *existing* contract is based on the RESTATEMENT (SECOND) OF TORTS § 766 (1977):

> One [Land O' Lakes] who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another [Corcoran] and a third person [Norwest Bank] by inducing or otherwise causing the third person [Norwest Bank] not to perform the contract, is subject to liability to the other [Corcoran] for pecuniary loss resulting to the other [Corcoran] from the failure of the third person [Norwest Bank] to perform the contract.

*Grahek v. Voluntary Hosp. Co-op.*, 473 N.W.2d 31, 35 (Iowa 1991); *Reihmann v. Foerstner*, 375 N.W.2d 677, 683 (Iowa

---

1. Because the court concludes that, as a matter of law, the Corcorans' right to prosecute this action was not foreclosed by Norwest's foreclosure of its security interest, the court need not reach the Corcorans' argument that

Land O' Lakes is estopped to assert its "foreclosure" argument by failing to object to identification of this lawsuit as an asset of their bankruptcy estate.

1985); Iowa Civil Jury Instruction 1200.1. Thus, the plaintiff must prove the following elements

1. The plaintiff had a valid contract.

2. The defendant knew of the contract.

3. The defendant intentionally and improperly interfered with the contract.

4. The interference caused the contracting parties not to perform the contract with the plaintiff.

5. The amount of the plaintiff's damages.

See Water Dev. Co. v. Board of Water Works, 488 N.W.2d 158, 161 (Iowa 1992) (citing Nesler v. Fisher & Co., Inc., 452 N.W.2d 191, 194 (Iowa 1990)); see also Iowa Civil Jury Instruction 1200 .1. This tort is not committed by parties to the contract; the tortfeasor must interfere with a contract between another and a third person. Grahek, 473 N.W.2d at 35. The tort plainly requires that a third party, who is a party to the underlying contract, be induced or caused to act by the alleged tortfeasor, who must be a stranger to the contract. Id.

■ Unlike tortious interference with a contract, the tort of interference with prospective business relations or advantages does not require a showing that a contract existed between the plaintiff and another. Toney v. Casey's Gen. Stores, Inc., 372 N.W.2d 220, 222 (Iowa 1985); Clark v. Figge, 181 N.W.2d 211, 213 (Iowa 1970). The elements of this tort are as follows:

1. The plaintiff had a prospective [contract or business relationship] with a [third person].

2. The defendant knew of the prospective relationship.

3. The defendant intentionally and improperly interfered with the relationship by [set forth the particulars supported by the evidence].

4. a. The interference caused [the third person] not [to enter into or continue] the relationship [or]

b. The interference prevented the plaintiff from [entering or continuing] the relationship.

5. The amount of damage.

King v. Sioux City Radiological Group, P.C., 985 F.Supp. 869, 882 (N.D.Iowa 1997) (citing Iowa Civil Jury Instructions, 1200.2, and citing generally Nesler v. Fisher & Co., Inc., 452 N.W.2d 191, 199 (Iowa 1990); Gordon v. Noel, 356 N.W.2d 559, 563 (Iowa 1984); and Harsha v. State Sav. Bank, 346 N.W.2d 791, 799 (Iowa 1984)); accord Tredrea v. Anesthesia & Analgesia, P.C., 584 N.W.2d 276, 283 (Iowa 1998) (identifying essentially the same elements of the tort); Iowa Coal Mining Co. v. Monroe County, 555 N.W.2d 418, 438 (Iowa 1996) (same).

### 2. The distinction between the theories

In King v. Sioux City Radiological Group, P.C., 985 F.Supp. 869 (N.D.Iowa 1997), this court observed that an essential distinction, in most cases, between the tort of interference with prospective contractual or business relations and the tort of interference with existing contractual relations is that, for the tort of interference with prospective business relations or advantages, the tortfeasor must be shown to have had as a purpose for its interference "to financially injure or destroy the plaintiff," while no such showing of intent is necessary for the tort of interference with an existing contract. See King, 985 F.Supp. at 882 (citing Burke v. Hawkeye Nat'l Life Ins. Co., 474 N.W.2d 110, 114 (Iowa 1991); Nesler v. Fisher & Co., Inc., 452 N.W.2d 191, 199 (Iowa 1990); Page County Appliance Ctr., Inc. v. Honeywell, Inc., 347 N.W.2d 171, 177 (Iowa 1984); Harsha v. State Sav. Bank, 346 N.W.2d 791, 799 (Iowa 1984); First Medical, Inc. v. Embassy Manor Care Ctr., Inc., 483 N.W.2d 14, 16 (Iowa Ct.App.1992)). However, the Eighth Circuit Court of Appeals has discounted such a distinction in Iowa law:

In Wilkin Elevator v. Bennett State Bank, 522 N.W.2d 57, 62 (Iowa 1994),

the court stated that "to establish improper interference a showing is required that the actor's predominant purpose was to injure or destroy the plaintiff's business." Intermodal argues that this case was an anomaly, that it inexplicably abandoned the distinction that Iowa courts had long drawn between the tort of interference with an existing contract and the tort of interference with a prospective contract. Only the latter tort, Intermodal argues, involves the higher burden, a burden that Intermodal concededly could not carry. But the recent case of *Berger v. Cas' Feed Store, Inc.,* 543 N.W.2d 597, 599 (Iowa 1996), decided after the district court entered judgment in this case, cited Wilkin Elevator approvingly in circumstances in which the plaintiff claimed an interference with an existing contract. The court quoted approvingly the portion of *Wilkin Elevator* that had held that the plaintiff there had produced "no evidence of a predominant purpose of causing injury to the plaintiffs," and held that "a party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests." *Id.*

These cases indicate to us that in Iowa the tort of interference with contract creates, in essence, a cause of action for unsavory predatory behavior ("predominant purpose to injure or destroy") ....

*Rail Intermodal Specialists, Inc. v. General Elec. Capital Corp.,* 103 F.3d 627, 631 (8th Cir.1996). Thus, under *Rail Intermodal,* for both versions of the tortious interference tort, the Corcorans would have to show that Land O' Lakes had the improper, "predominant purpose to injure or destroy" the Corcorans. *Id.* Relying on *Rail Intermodal,* Land O' Lakes maintains that the Corcorans cannot make such a showing.

However, very recently, in a pair of decisions handed down on January 21, 1999, the Iowa Supreme Court again reiterated the distinction between the two versions of the tortious interference tort:

> Both theories alleged by the agents, intentional interference with contract and intentional interference with prospective business relations, require proof that the defendant intentionally and improperly interfered with the relationship at issue. *See Willey v. Riley,* 541 N.W.2d 521, 526–27 (Iowa 1995); *Robert's River Rides, Inc. v. Steamboat Dev. Corp.,* 520 N.W.2d 294, 303 (Iowa 1994). *The distinction between these torts is that to recover for interference with prospective business relations, a plaintiff must prove the defendant acted with the sole or predominant purpose to injure or financially destroy the plaintiff. See Willey,* 541 N.W.2d at 526–27; *Burke v. Hawkeye Natl. Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991).

*Compiano v. Hawkeye Bank & Trust of Des Moines,* 588 N.W.2d 462, 464 (Iowa 1999) (emphasis added); *accord Financial Mktg. Servs., Inc. v. Hawkeye Bank & Trust of Des Moines,* 588 N.W.2d 450, 454 (Iowa 1999) (also citing *Willey* for the proposition that "[l]iability under this theory [tortious interference with prospective business advantage] is imposed when a person intentionally and improperly interferes with another's prospective contractual relationships with the sole or primary purpose to injure or destroy the plaintiff," but not requiring such proof to show improper purpose for tortious interference with a contract).

■ Thus, under the most recent formulations of the versions of the tort by the Iowa Supreme Court, improper purpose for the tort of interference with an *existing* contract requires consideration of the following factors from the RESTATEMENT (SECOND) OF TORTS § 767:(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor;

(e) the social interests protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties. *Financial Mktg. Servs., Inc.,* 588 N.W.2d 450 at 457 (quoting *Toney v. Casey's Gen. Stores, Inc.,* 460 N.W.2d 849, 853 (Iowa 1990), in turn quoting RESTATEMENT (SECOND) OF TORTS § 767 (1979)). For this version of the tort, the "basic focus of the analysis is 'whether the actor's conduct was fair and reasonable under the circumstances.'" *Id.* at 457 (again quoting *Toney,* in turn quoting RESTATEMENT (SECOND) OF TORTS § 767 cmt. j). On the other hand, proof of improper purpose for the tort of interference with *prospective* contractual relationships requires proof that the actor's "sole or primary purpose [was] to injure or destroy the plaintiff." *Financial Mktg. Servs., Inc.,* 588 N.W.2d at 459; *Compiano,* 588 N.W.2d at 464.

### 3. The record on "improper purpose" here

■ Although the court concludes that if it were the trier of fact, *on the present record,* it would find the Corcorans have not *proved* an "improper purpose" as required for either version of the tort, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick,* 90 F.3d at 1376–77; *Johnson,* 906 F.2d at 1237. The court finds that the Corcorans have generated genuine issues of material fact as to Land O' Lakes' "improper purpose" on both of their tortious interference theories, albeit by the barest of margins.

As to the lesser requirements to prove improper purpose for the tort of interference with an existing contract, again, the court must consider the extent to which the Corcorans have generated genuine issues of material fact on the factors identified in RESTATEMENT (SECOND) OF TORTS § 767, keeping in mind that the "basic focus of the analysis is 'whether the actor's conduct was fair and reasonable under the circumstances.'" *Financial Mktg. Servs., Inc.,* 588 N.W.2d at 457 (quoting *Toney,* 460 N.W.2d at 853, in turn quoting RESTATEMENT (SECOND) OF TORTS § 767 (1979) & cmt. j). Although the Corcorans rely excessively on Edward Corcoran's self-serving affidavit—which asserts various allegations, hypotheses, and conclusions about what Land O' Lakes' motivation was for its conduct and argues what inferences should be drawn from certain incidents— as generating genuine issues of material fact, *cf. Rose–Maston,* 133 F.3d at 1107 ("[A] non-moving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial."); *Thomas,* 108 F.3d at 959; *Ruby,* 76 F.3d at 911, the Corcorans do, to some extent, go beyond the pleadings and the self-serving affidavit to designate in record evidence "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka,* 122 F.3d at 562; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. For example, viewing all of the facts in the light most favorable to the Corcorans and giving them the benefit of all reasonable inferences that can be drawn from the facts, *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377; *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996), the record does generate a genuine issue of material fact that Land O' Lakes' conduct was *not* fair and reasonable under the circumstances. *Financial Mktg. Servs., Inc.,* 588 N.W.2d at 457. Such inferences arise, for example, from record evidence that Land O' Lakes did not deliver stock for a period of time when Corcoran contends Land O' Lakes was attempting to "coerce" him into signing a less favorable new contract, and

Land O' Lakes' delays in picking up or paying for stock.

■ As to their claim of interference with prospective contracts with Norwest, the Corcorans ultimately have a more difficult burden to prove that Land O' Lakes' "sole or primary purpose [was] to injure or destroy the plaintiff." *Financial Mktg. Servs., Inc.*, 588 N.W.2d at 459; *Compiano*, 588 N.W.2d at 464. Nonetheless, genuine issues of material fact sufficient for the claim to go to the jury, although just barely, arise from the same evidence mentioned just above as well as from the Corcorans' evidence of Land O' Lakes' failure to take adequate steps to prevent the third PRRS outbreak and to act either pursuant to the old or a new contract in such a way that Corcoran's operations would "cash flow," coupled with evidence, not merely innuendo, that Land O' Lakes was attempting to move toward larger producers and the concomitant reasonable inference that Land O' Lakes would destroy Corcoran to get out of its constricting relationship with him.

Here, Land O' Lakes' assertion of the "no economic sense" rule has some appeal, because the Corcorans' assertion of improper interference would require the trier of fact to believe that Land O' Lakes intentionally infected its own livestock with PRRS or dragged its corporate feet in treating the PRRS outbreaks that occurred by chance in Corcoran's facility in order to drive Corcoran out of business, all because Land O' Lakes purportedly had decided to work with larger producers. The court agrees that a jury could reasonably find that, "as [a] presumably rational business[ ], [Land O' Lakes] had every incentive *not* to engage in the conduct with which [it is] charged, for its likely effect would be to generate losses for [the Corcorans] without corresponding gains [to Land O' Lakes]." *Matsushita*, 475 U.S. at 595, 106 S.Ct. 1348. However, " 'a party moving for summary judgment is not enti-

tled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial.' " *Handeen*, 112 F.3d at 1354. While Land O' Lakes' assertion that it would not engage in such self-destructive behavior is perhaps *more plausible* than the Corcorans' assertion that Land O' Lakes would engage in such behavior for any reason, something more than the greater plausibility of the movant's evidence is required to establish entitlement to summary judgment. As this court explained in *Beemer Enterprises*, the non-movant's theory must be *implausible*, not just *less plausible* than the movant's, in light of the record as a whole before the movant is entitled to summary judgment. *Beemer Enters., Inc.*, 976 F.Supp. at 1240. There is some plausibility to, *i.e.*, there are some reasonable inferences in support of, the Corcorans' argument that Land O' Lakes *would* engage in such apparently self-destructive behavior *for the purpose of ridding itself of an inconvenient small producer* when its own records show it had a corporate plan to increase use of larger producers, because larger producers were more economically beneficial. Again, the court has considerable doubt that the evidence presented at trial will show anything but that Land O' Lakes acted in a reasonable fashion either to assist Corcoran or to protect its own reasonable financial interests. However, the court concludes that on the present record, the question is one for the jury. *See Quick*, 90 F.3d at 1376–77 (on a motion for summary judgment, the court must determine whether there are genuine issues for trial); *Johnson*, 906 F.2d at 1237. In particular, the question of a defendant's motive, as it can be inferred from circumstantial evidence, seems to the court to be a matter particularly appropriate for jury determination. *Cf., e.g., Snow*, 128 F.3d at 1205 (requiring particular deference to the non-movant on summary judgment in discrimination cases, because such cases are based on inferences from circumstantial evidence of

discriminatory motive); *Webb,* 94 F.3d at 486 (same); *Wooten,* 58 F.3d at 385 (same).

Therefore, Land O' Lakes' motion for summary judgment on the Corcorans' tortious interference claims will denied.

### D. Breach Of Fiduciary Duty

#### 1. Fiduciary relationships under Iowa law

As this court recently observed in *Oeltjenbrun v. CSA Investors, Inc.,* 3 F.Supp.2d 1024 (N.D.Iowa 1998), the Iowa Supreme Court has defined a fiduciary relationship in the following manner:

"A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship." *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986) (citing Restatement (Second) of Torts § 874 cmt. a (1979)). We have also noted that

a confidential relationship "exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.... The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. [The][p]urpose of the doctrine is to defeat and protect betrayals of trust and abuses of confidence."

*Hoffman v. National Med. Enters., Inc.,* 442 N.W.2d 123, 125 (Iowa 1989) (quoting *Oehler v. Hoffman,* 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962)) ....

.... [W]e are cognizant of the fact that "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Kurth,* 380 N.W.2d at 696.

*Oeltjenbrun,* 3 F.Supp.2d at 1053 (quoting *Wilson v. IBP, Inc.,* 558 N.W.2d 132, 138 (Iowa 1996), *cert. denied,* — U.S. —, 118

S.Ct. 52, 139 L.Ed.2d 17 (1997)); *see also Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 647–48 (Iowa 1995) (also recounting indicia of a fiduciary relationship); *Anderson v. Boeke,* 491 N.W.2d 182, 188 (Iowa Ct.App.1992) (" 'A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation,' " quoting *Kurth,* 380 N.W.2d at 695, in turn quoting Restatement (Second) of Torts § 874 cmt. a).

As this court also explained in *Oeltjenbrun,*

"Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and exercising of influence over one person by another; the inequality of the parties; and the dependence of one person on another." *Irons v. Community State Bank,* 461 N.W.2d 849, 852 (Iowa Ct.App.1990). Fiduciary duty arises, for example, between attorneys and clients, guardians and wards, and principals and agents. *Kurth,* 380 N.W.2d at 698; *accord Engstrand v. West Des Moines State Bank,* 516 N.W.2d 797, 799 (Iowa 1994) (citing *Kurth*).

*Oeltjenbrun,* 3 F.Supp.2d at 1053; *accord Zumaris,* 538 N.W.2d at 647–48 ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.").

#### 2. Arguments of the parties

Land O' Lakes particularly relies on this court's conclusion in *Oeltjenbrun* that a fiduciary duty does not arise when the record at best demonstrates an arm's-length business relationship between the plaintiff and the purported fiduciary. *Id.* Land O' Lakes also notes that the Agree-

ment specifically eschews any principal-agent or joint venture relationship between the parties that might give rise to a fiduciary relationship, and asserts that it never consented to any fiduciary relationship with Corcoran. Finally, Land O' Lakes relies on Corcoran's autonomy and failure to place any of his property under Land O' Lakes' control as precluding any fiduciary relationship. The Corcorans rely primarily on the control and dominance Land O' Lakes exercised in the relationship as establishing a fiduciary relationship, as well as Land O' Lakes' obligations to provide counsel and advice to Corcoran in the running of his operations.

### 3. Inferences of a fiduciary relationship

■ The court notes, first, that the record here, unlike the record in *Oeltjenbrun*, suggests far more than a simple arm's-length business relationship between the parties to the Agreement. *Cf. Oeltjenbrun*, 3 F.Supp.2d at 1053. Here, although the Agreement does indicate that the parties did not intend to create a principal-agent or joint venture relationship, *see* Agreement, p. 11, ¶ 8, the Agreement does repose unprecedented control, dominance, and influence in Land O' Lakes' hands. *Oeltjenbrun*, 3 F.Supp.2d at 1053 (treating these facts as indicia of a fiduciary relationship); *accord Wilson*, 558 N.W.2d at 138; *Zumaris*, 538 N.W.2d at 647–48. For example, Land O' Lakes had the right to direct Corcoran with respect to all matters relating to the care of the livestock; Land O' Lakes was required to "provide continuing counsel and advice in the care and production of the livestock," Agreement, p. 3, ¶ 3; and Corcoran was required to "take any action reasonably requested by [Land O' Lakes] to raise the livestock in accordance with the standards of [Land O' Lakes] which may be in effect from time to time." Agreement, p. 6, ¶ D.1. Corcorans' counsel has also elicited deposition testimony from various Land O' Lakes representatives concerning their belief that they would be obligated to act with the interests of their producers in mind. These indicia in the record are sufficient to present a jury question on whether a fiduciary relationship existed between Corcoran and Land O' Lakes. *Compare Wilson*, 558 N.W.2d at 139 (concluding that a jury question on the existence of a fiduciary relationship was presented from evidence that "could reasonably be interpreted as involving a degree of domination, even though [the plaintiff] also had the freedom to seek alternative treatment," and evidence that the purported fiduciary viewed her first loyalty to be to the plaintiff).

Therefore, Land O' Lakes' motion for summary judgment on the Corcorans' breach-of-fiduciary-duty claim will also be denied.

### E. Punitive Damages

■ Although the Corcorans took some pains to argue that the record warranted submission of their punitive damages claim to the jury on both their tortious interference and breach-of-fiduciary-duty claims, the first thrust of Land O' Lakes' motion for summary judgment was somewhat different. Land O' Lakes argued that, in the absence of viable tort claims, which it had sought to eliminate by summary judgment, punitive damages were not available. In particular, Land O' Lakes argued that punitive damages are generally not available for breach of contract. In the alternative, if the Corcorans' tort claims survived summary judgment, Land O' Lakes argued that the Corcorans could not generate a genuine issue of material fact that Land O' Lakes acted maliciously as required for imposition of punitive damages under Iowa Code § 668A.1.

First, the court will deny summary judgment on the tort claims, so that predicate claims on which punitive damages have been sought and upon which such damages may be awarded remain part of this litigation. Second, the court concludes, again just barely, that giving the Corcorans the

benefit of all reasonable inferences that can be drawn from the facts, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377; *Rifkin*, 78 F.3d at 1280, the record does generate a genuine issue of material fact that Land O' Lakes' conduct rose (or sunk) to the level where punitive damages could reasonably be imposed. These inferences admittedly arise as a further link in the chain of inferences from the record facts concerning Land O' Lakes' conduct to inferences supporting the Corcorans' asserted motives for that conduct, now to the inference that the motives were malicious, as required by IOWA CODE § 668A.1. At trial, Land O' Lakes may be able to demonstrate that the chain of inferences breaks at a very early link. Nevertheless, having concluded that motivation is properly a question for the jury as to the tortious interference claim, the court also concludes that questions about motivation, the crux of proof of entitlement to punitive damages, also precludes summary judgment on the Corcorans' prayer for punitive damages. Therefore, Land O' Lakes' motion for summary judgment on the Corcorans' prayer for punitive damages will also be denied.

### III. CONCLUSION

Land O' Lakes' motion for summary judgment, although well-founded, must nonetheless be denied on each of the grounds asserted. First, the court concludes as a matter of law that foreclosure of Norwest Bank's security interest in the Corcorans' collateral did not foreclose the Corcorans' right to prosecute this action. Although that collateral included the Corcorans' breach-of-contract claim, under the Iowa UCC, it did not include their tort claims. Furthermore, the court concludes, as a matter of law, that the state court's foreclosure judgment only established Norwest's superior lien in a judgment on the Corcorans' breach-of-contract claim, but did not foreclose the Corcorans' right to assert such a claim.

Next, the court concludes that genuine issues of material fact, although just barely, preclude summary judgment on the Corcorans' tort claims. Although the Eighth Circuit Court of Appeals had opined that under Iowa law, tortious interference with either existing or prospective contracts requires proof of an improper purpose to "injure or destroy" the plaintiff, this court finds that the Iowa Supreme Court has recently reiterated the distinction in the nature of the "improper purposes" that will support a claim under the two theories of tortious interference: interference with an *existing* contract requires proof that the actor's conduct was not fair and reasonable under the circumstances, while interference with a *prospective* contract requires proof of a primary purpose "to financially injure or destroy" the plaintiff. Furthermore, the court finds that genuine issues of material fact as to the requisite improper purpose for each kind of tortious interference alleged exists on the present record. Similarly, the court finds that there are genuine issues of material fact as to whether Land O' Lakes and Corcoran had a fiduciary relationship, precluding summary judgment in Land O' Lakes' favor on the Corcorans' breach-of-fiduciary-duty claim.

Finally, the court concludes that viable tort claims exist as predicates for the Corcorans' prayer for punitive damages. The court finds further that genuine issues of material fact as to Land O' Lakes' motivation for the conduct alleged, again just barely, support submission of the Corcorans' prayer for punitive damages to the jury.

Therefore, Land O' Lakes' motion for summary judgment is **denied** in its entirety. In addition, the Corcorans' January 25, 1999, motion for leave to file a supplemental brief is **granted.**

**IT IS SO ORDERED.**